# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| 1. THE CHEROKEE NATION,<br>a federally-recognized Indian Tribe, | ) ) ) | |
| 2. CHEROKEE NATION BUSINESSES,<br>LLC, a limited liability company of the<br>Cherokee Nation, | ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 4:20-cv-00596-JED-CDL |
| 1. JOE BUNCH, in his official capacities as<br>the Chief of the United Keetoowah Band of<br>Cherokee Indians in Oklahoma and as *ex<br>officio* member of the United Keetoowah<br>Band Corporate Board, | ) ) ) ) ) ) | Related: No. 12-cv-493-GKF-JFJ |
| 2. JAMIE THOMPSON, in his official<br>capacities as Assistant Chief of the United<br>Keetoowah Band of Cherokee Indians<br>in Oklahoma and as the Chairman of the<br>United Keetoowah Band Corporate Board, | ) ) ) ) ) ) | |
| 3. JOYCE FOURKILLER, in her official<br>capacities as Secretary of the United<br>Keetoowah Band of Cherokee Indians in<br>Oklahoma and as *ex officio* member of the<br>United Keetoowah Band Corporate Board, | ) ) ) ) ) ) | |
| 4. ELLA MAE WORLEY, in her official<br>capacities as Treasurer of the United<br>Keetoowah Band of Cherokee Indians in<br>Oklahoma and as *ex officio* member of the<br>United Keetoowah Band Corporate Board, | ) ) ) ) ) ) | |
| 5. EDDIE SACKS, in his official capacities<br>as Member of the United Keetoowah Band<br>Tribal Council and as Treasurer of the<br>United Keetoowah Band Corporate Board, | ) ) ) ) ) | |

165345_1

6. JEANNIE TIDWELL, in her official )
capacities as Member of the United )
Keetoowah Band Tribal Council and as *ex* )
*officio* member of the United Keetoowah )
Band Corporate Board, )
)
7. ADALENE SMITH, in her official )
capacities as Member of the United )
Keetoowah Band Tribal Council and as *ex* )
*officio* member of the United Keetoowah )
Band Corporate Board, )
)
8. FRANKIE STILL, in his official )
capacities as Member of the United )
Keetoowah Band Tribal Council and as *ex* )
*officio* member of the United Keetoowah )
Band Corporate Board, )
)
9. SHARON BENOIT, in her official )
capacities as Member of the United )
Keetoowah Band Tribal Council and as *ex* )
*officio* member of the United Keetoowah )
Band Corporate Board, )
)
10. PEGGY GIRTY, in her official )
capacities as Member of the United )
Keetoowah Band Tribal Council and as *ex* )
*officio* member of the United Keetoowah )
Band Corporate Board, )
)
11. CHARLES SMOKE, in his official )
capacities as Member of the United )
Keetoowah Band Tribal Council and as *ex* )
*officio* member of the United Keetoowah )
Band Corporate Board, )
)
12. BERRY DOTSON, in his official )
capacities as Member of the United )
Keetoowah Band Tribal Council and as *ex* )
*officio* member of the United Keetoowah )
Band Corporate Board, )
)

13. JEFF WACOCHE, in his official          )
capacities as Member of the United         )
Keetoowah Band Tribal Council and as *ex*  )
*officio* member of the United Keetoowah   )
Band Corporate Board,                      )
                                           )
14. ADAM PROCTOR, in his official          )
capacity as Vice-Chairman of the United    )
Keetoowah Band Corporate Board,            )
                                           )
15. ELDINE STEVENS, in her official        )
capacity as Secretary of the United Keetoowah )
Band Corporate Board, and                  )
                                           )
16. JOHN ADAIR, in his official capacity as )
Member of the United Keetoowah Band        )
Corporate Board,                           )
                                           )
17. AN UNKNOWN NUMBER OF JANE              )
OR JOHN DOES, in their official capacities as )
Members of the Gaming Commission           )
of the United Keetoowah Band of            )
Cherokee Indians in Oklahoma,              )
                                           )
        Defendants.                        )
_____    )

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     This lawsuit is brought by the Cherokee Nation and Cherokee Nation

Businesses, LLC (CNB) and seeks declaratory and injunctive relief against officials of the

United Keetoowah Band of Cherokee Indians in Oklahoma (UKB), the United Keetoowah

Band Corporate Board and the Gaming Commission of the United Keetoowah Band, who

are acting to license, conduct, and regulate gaming within the Cherokee Nation Reservation

on and adjacent to fee lands previously determined by this Court not to be eligible for

gaming activities.  In so doing, they are thereby interfering with the Cherokee Nation's

1

165345-1

sovereign authority and with its rights guaranteed under its treaties with the United States, and violating federal law.

2.      In *Cherokee Nation v. Bernhardt*, No. 12-CV-493-GKF-JFJ, 2020 WL 1429946 (N.D. Okla. Mar. 24, 2020), *appeal docketed*, Nos. 20-5054, 20-5055 (10th Cir. May 26, 2020), this Court found that there is not a "'former reservation' of the United Keetoowah Band of Cherokee Indians in Oklahoma under 25 U.S.C. § 2719(a)(2)(A)(i) and 25 C.F.R. § 292.9" because "[n]o reservation has ever been established by treaty, Executive Order, or Secretarial Order for the UKB tribe," and that "gaming regulated by the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2701-2721, cannot be conducted on" a 2.03-acre parcel of fee land owned by UKB that was at issue in that case,  2020 WL 1429946 at *10, *13.  The Court also enjoined the Secretary of Interior from taking the same parcel of land into trust for gaming by UKB.  *Id.* at *13.

3.      Notwithstanding this Court's injunction, UKB has now announced that it imminently intends to license, conduct or regulate gaming on a legally indistinguishable parcel of UKB fee land that is located immediately adjacent to the parcel at issue in the *Bernhardt* case. On August 19, 2020, UKB gave a 120-day notice to the National Indian Gaming Commission (NIGC) of its intent to issue a gaming facility license for the "River Brewhouse," which is a .23-acre site owned in fee by UKB that is located at 2380 Muskogee Avenue, Tahlequah, Oklahoma.  This location is currently the site of a business operated by the United Keetoowah Band of Cherokee Indians in Oklahoma Corporation (UKB Corporation), an entity chartered by UKB under federal law.  This location is

165345-1

adjacent to the parcel of land at issue in the *Bernhardt* case and shares a parking lot with it.  UKB also apparently intends to license and conduct gaming at the 2.03-acre parcel as well: It has posted a large sign at the 2.03 acre site with a picture of a building labeled "Casino" and containing the statements "NEW PROJECT" and "COMING SOON…."

4.       The 120-day notice provided to the NIGC expires on December 19, 2020.  It is apparent from this notification and from the sign posted that UKB intends to conduct gaming at the River Brewhouse site as soon as December 19, 2020, and on the 2.03-acre parcel soon thereafter.

5.       Neither parcel of land is held in trust for UKB.  UKB's theory, instead, appears to be that these sites are located within a UKB reservation.  In its notice to the NIGC, UKB refers to the River Brewhouse site as "held in fee by the Keetoowah Cherokee within its reservation."

6.       This assertion that UKB has a reservation is wrong.  As this Court concluded in *Bernhardt*, "[n]o reservation has ever been established by treaty, Executive Order, or Secretarial Order for the UKB tribe."  *Bernhardt*, 2020 WL 1429946, at *10.  UKB has no "former reservation."  Nor does UKB have any current "reservation."  Thus, neither the River Brewhouse site nor the adjacent 2.03-acre site is located within a UKB reservation. Accordingly, neither site satisfies the Indian Gaming Regulatory Act (IGRA) definition of "Indian lands" over which UKB exercises jurisdiction, and on which it could lawfully conduct gaming under federal law.  *See* 25 U.S.C. § 2703(4).

7.      Both sites, however, are located within the Cherokee Nation Reservation and therefore on the "Indian lands" of the Cherokee Nation.  *See State v. Hogner*, No. CF-2015-263 (Okla. Dist. Ct. Sept. 30, 2020), *on review* No. F-2018-138 (Okla. Crim. App.) (recognizing current Cherokee Nation Reservation boundaries as set by Cherokee treaties with the United States); *Perales v. State*, No. CF-2015-355 (Okla. Dist. Ct. Oct. 22, 2020), *on review* No. F-2018-383 (Okla. Crim. App.) (same); *State v. Cottingham*, No. CF-2015-350 (Okla. Dist. Ct. Oct. 29, 2020), *on review* No. F-2017-1294 (Okla. Crim. App.) (same); *State v. Cole*, No. CF-2002-597 (Okla. Dist. Ct. Nov. 12, 2020), *on review* No. PCD-2020-529 (Okla. Crim. App.) (same); *State v. Shriver*, No. CF-2015-395 (Okla. Dist. Ct. Nov. 12, 2020), *on review* No. F-2017-1279 (Okla. Crim. App.) (same); *State v. Shriver*, No. CF-2015-394 (Okla. Dist. Ct. Nov. 12, 2020), *on review* No. F-2017-1276 (Okla. Crim. App.) (same); *State v. Spears*, No. CF-2017-1013 (Okla. Dist. Ct. Nov. 12, 2020), *on review*  No. F-2019-330 (Okla. Crim. App.) (same).

8.      In order to protect public health and safety, the only lawful conduct of gaming on the Cherokee Nation Reservation are those games licensed by the Cherokee Nation Gaming Commission, which licenses and extensively regulates gaming operations by the Cherokee Nation and its subsidiaries or agents within the Cherokee Nation Reservation.  All other gaming activities and operations are prohibited by the Cherokee Nation's Criminal Code.  The Cherokee Nation's extensive regulation of gaming on its Reservation is an expression of its sovereign right to self-government on its Reservation, a right which is guaranteed by treaties that the Nation signed with the United States when

4

the Nation agreed to remove to Oklahoma in the 1830s, and again after the Civil War in the 1860s.  UKB's plan to conduct gaming on the Cherokee Nation Reservation in violation of Cherokee Nation law interferes with the Cherokee Nation's exercise of its sovereign powers and with its treaty-guaranteed right to self-government on the Cherokee Nation Reservation.

9.     Further, because the River Brewhouse site and the adjacent 2.03-acre site do not constitute UKB "Indian lands" on which UKB can conduct gaming under IGRA, UKB does not have any legal right under federal law to license, conduct or regulate such gaming there.  In addition, because UKB has no "Indian lands" on which it can conduct gaming, *see* 25 U.S.C. § 2719, UKB does not have an operative tribal gaming ordinance which is necessary for the lawful licensing, conduct and regulation of gaming under federal law.

10.     Defendants' actions, which violate Cherokee law and unlawfully interfere with the Nation's exercise of its sovereign powers and rights guaranteed by its treaties with the United States and by federal law, threaten the Cherokee Nation's sovereignty and governance of its Reservation by purporting to assert UKB sovereign authority throughout the Cherokee Nation Reservation – authority which UKB does not possess.  Moreover, Defendants' actions threaten to bring illegal competition to the Cherokee Nation's and CNB's conduct of lawful gaming in the highly competitive Oklahoma gaming market. Such illegal competition will reduce the Nation's gaming revenues that fund essential governmental services and which are earned by the Cherokee Nation and CNB on the Cherokee Nation Reservation.  The Cherokee Nation uses these gaming revenues to fund

165345-1

its governmental programs and services which support, *inter alia*, public safety, social services, and other services benefitting the Cherokee Nation's citizens and the residents of the Cherokee Nation Reservation.  As such, UKB's threatened competition also constitutes a direct attack on the Nation's governmental operations across its Reservation.

11.     The Cherokee Nation and CNB bring this lawsuit against the Chief, Assistant Chief, and other members of the Tribal Council of UKB, as well as against the members of the UKB Corporate Board and UKB Gaming Commission, all in their official capacities, under the doctrine of *Ex parte Young*, 209 U.S. 123 (1908); *see Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1153-56 (10th Cir. 2011).

## I.     PARTIES

12.     The Plaintiff Cherokee Nation is a federally-recognized Indian Tribe, *see* Indian Entities Recognized by and Eligible To Receive Services From the United States Bureau of Indian Affairs, 85 Fed. Reg. 5462, 5463 (Jan. 30, 2020), with a governing body duly recognized by the Department of the Interior.

13.     The Plaintiff CNB is a limited liability company organized under the laws of, and wholly owned by, the Cherokee Nation.  Its headquarters are located in Catoosa, Oklahoma.  CNB operates the Cherokee Nation's businesses throughout the State of Oklahoma, including the Cherokee Nation's IGRA gaming enterprises located on the Cherokee Nation Reservation.

14.     The Defendant Joe Bunch is the Chief of the United Keetoowah Band of Cherokee Indians in Oklahoma, which is a federally-recognized Indian Tribe, *see id.* at

165345-1

5466, with a governing body duly recognized by the Department of the Interior.  As Chief, he is also a member of the Tribal Council.  *See* Constitution of the United Keetoowah Band of Cherokee Indians in Oklahoma, art. V § 2; *id.* art. VI; By-laws of the Keetoowah Band of Cherokee Indians in Oklahoma, art. I, § 1.  The Tribal Council is the "supreme governing body" of the UKB under UKB's Constitution, art. V § 1, and has "power to appoint subordinate personnel, committees and representatives, to transact business, and otherwise speak or act on behalf of the Band in all matters on which the Band is empowered to act now or may be empowered to act upon in the future" as well as "to delegate such powers to individuals or subordinate groups consistent with law, and under such rules and regulations as may be prescribed by the Council," *id.* art. V § 5.  As such, the Tribal Council has control over all subordinate officials, entities, and bodies of the UKB government and ultimately exercises regulatory and supervisory control over all functions of UKB and the entities that UKB controls, including the UKB Corporation, which includes ensuring they comply with the requirements of the law.  *See* UKB Corporate Board Act, Res. No. 15-UKB-57 § 102(E) (2015) (UKB Corporation "wholly owned, operated, and governed by" UKB).  The Tribal Council is comprised of nine Members and four officers – a Chief, Assistant Chief, Secretary, and Treasurer.  *See* UKB Const. art. V § 2; *id.* art. VI; By-Laws of the Keetoowah Band of Cherokee Indians in Oklahoma, art. I, §§ 1-4.

15.     As Chief, Defendant Bunch is also an *ex officio* member of the United Keetoowah Band Corporate Board (UKB Corporate Board).  *See* UKB Corporate Board Act § 204(D).  The UKB Corporate Board is an arm of the UKB tribal government that

165345-1

was established under tribal law by the UKB Tribal Council.  *See id.* § 202(A).  The UKB Tribal Council established the Corporate Board to manage and operate the UKB Corporation, pursuant to its powers under the UKB Constitution to "appoint subordinate personnel, committees, and representatives" to transact UKB's business or speak or act on behalf of UKB.  *Id.* (citing UKB Const. art. V § 5).  The UKB Corporation, through the Corporate Board, is responsible for adopting, administering, and amending the bylaws, regulations, and policies of the UKB Corporation, *id.* § 301(A)(2), may "engage in any lawful business" and to "exercise any of the powers of a business corporation, limited liability company, Subsidiary Corporation, or Subsidiary LLC as defined by applicable law," *id.* § 301(A)(10), can exercise "[a]ll powers as set forth in the . . . Corporate Charter and applicable federal law," *id.* § 301(A)(12), and can "operate and manage all tribal business entities and enterprises, including but not limited to all gaming enterprises and authorities of the UKB," *id.* § 301(B)(11).  The UKB Corporate Board's members are "jointly responsible for the operation and management" of the UKB Corporation, *id.* § 203, and therefore the operation of its subordinate entities and their compliance with the law. There are five regular members of the UKB Corporate Board.  *Id.*  All the members of the UKB Tribal Council are also *ex officio* members of the UKB Corporate Board, who can cast proxy votes for absent regular UKB Corporate Board members at Board meetings when authorized by the absent regular member.  *Id.* § 204(D).  Defendant Bunch is sued in his official capacities.

165345-1

16.     The Defendant Jamie Thompson is Chair of the UKB Corporate Board.  The Chair is a regular member of the UKB Corporate Board, elected to that position by the UKB Corporate Board from among its membership.  *Id.* § 210(A).  As Chair of the UKB Corporate Board, in addition to his responsibilities as a regular member, he is responsible for "carrying into effect all orders and resolutions of the Corporate Board as required or directed or as good business judgment requires."  *Id.* § 211(A).  Defendant Thompson is also Assistant Chief of the UKB.  As Assistant Chief, he is also a member of the Tribal Council.  *See* UKB Const. art. V § 2; *id.* art. VI; UKB By-Laws art. I, § 2.  Defendant Thompson is sued in his official capacities.

17.     The Defendant Adam Proctor is Vice Chair of the UKB Corporate Board. The Vice Chair is a regular member of the UKB Corporate Board, elected to that position by the UKB Corporate Board from among its membership.  UKB Corporate Board Act § 210(B).  Defendant Proctor is sued in his official capacity.

18.     The Defendant Eldine Stevens is Secretary of the UKB Corporate Board. The Secretary is a regular member of the UKB Corporate Board, elected to that position by the UKB Corporate Board from among its membership.  UKB Corporate Board Act § 210(C).  Defendant Stevens is sued in her official capacity.

19.     The Defendant John Adair is a member of the UKB Corporate Board and is sued in his official capacity.

20.     The Defendant Joyce Fourkiller is Secretary of UKB.  As Secretary, she is also a member of the Tribal Council, UKB Const. art. V § 2; *id.* art. VI; UKB By-Laws art.

9

I, § 3, and an *ex officio* member of the UKB Corporate Board, UKB Corporate Board Act § 204(D).  Defendant Fourkiller is sued in her official capacities.

21.     The Defendant Ella Mae Worley is Treasurer of UKB.  As Treasurer, she is also a member of the Tribal Council, UKB Const. art. V § 2; *id.* art. VI; UKB By-Laws art. I, § 4, and an *ex officio* member of the UKB Corporate Board, UKB Corporate Board Act § 204(D).  Defendant Worley is sued in her official capacities.

22.     The Defendant Eddie Sacks is a member of the UKB Tribal Council and Treasurer of the UKB Corporate Board.  Defendant Sacks is sued in his official capacities.

23.     The Defendant Jeannie Tidwell is a member of the UKB Tribal Council and an *ex officio* member of the UKB Corporate Board.  UKB Corporate Board Act § 204(D). Defendant Tidwell is sued in her official capacities.

24.     The Defendant Adalene Smith is a member of the UKB Tribal Council and an *ex officio* member of the UKB Corporate Board.  UKB Corporate Board Act § 204(D). Defendant Smith is sued in her official capacities.

25.     The Defendant Frankie Still is a member of the UKB Tribal Council and an *ex officio* member of the UKB Corporate Board.  UKB Corporate Board Act § 204(D). Defendant Still is sued in his official capacities.

26.     The Defendant Sharon Benoit is a member of the UKB Tribal Council and an *ex officio* member of the UKB Corporate Board.  UKB Corporate Board Act § 204(D). Defendant Benoit is sued in her official capacities.

165345-1

27.     The Defendant Peggy Girty is a member of the UKB Tribal Council and an *ex officio* member of the UKB Corporate Board.  UKB Corporate Board Act § 204(D).  Defendant Girty is sued in her official capacities.

28.     The Defendant Charles Smoke is a member of the UKB Tribal Council and an *ex officio* member of the UKB Corporate Board.  UKB Corporate Board Act § 204(D).  Defendant Smoke is sued in his official capacities.

29.     The Defendant Berry Dotson is a member of the UKB Tribal Council and an *ex officio* member of the UKB Corporate Board.  UKB Corporate Board Act § 204(D).  Defendant Dotson is sued in his official capacities.

30.     The Defendant Jeff Wacoche is a member of the UKB Tribal Council and an *ex officio* member of the UKB Corporate Board.  UKB Corporate Board Act § 204(D).  Defendant Wacoche is sued in his official capacities.

31.     The Defendants an unknown number of Jane and John Does are the Members of the Gaming Commission of UKB.  The Gaming Commission is charged with regulating the conduct of gaming by UKB and UKB-controlled entities and ensuring that such conduct of gaming complies with federal and tribal gaming laws.  Under the UKB Constitution, the Gaming Commission is ultimately answerable to the UKB Tribal Council.  UKB Const. art V. §§ 1, 5.

## II.     JURISDICTION AND VENUE

32.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331, which "gives a district court subject matter jurisdiction to decide any claim alleging

165345-1

a violation of IGRA," *Michigan v. Bay Mills Indian Cmty.*, 572 U.S. 782, 787 n.2 (2014). The Court also has subject matter jurisdiction under 28 U.S.C. § 1362 because the Plaintiff Cherokee Nation is a federally-recognized Indian Tribe with a governing body duly recognized by the Department of the Interior, and this action is brought to protect and enforce rights held by the Plaintiff Cherokee Nation under IGRA, and under the Treaty of New Echota and the Treaty of Washington of 1866 with the Cherokee.  The tribal sovereign immunity of UKB is inapplicable to the claims presented in this Complaint because this action is not brought against UKB itself but instead is brought against UKB tribal officials under the doctrine of *Ex parte Young*, which permits aggrieved parties to seek prospective relief, including declaratory and injunctive relief, against tribal officials who are violating their federal law rights.  *See Crowe & Dunlevy*, 640 F.3d at 1155-56; *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645 (2002).

33.     Venue is appropriate in this District under 28 U.S.C. § 1391(b)(2), because UKB is purporting to assert authority and jurisdiction throughout the Cherokee Nation Reservation, which is located within eight of the eleven counties in this District.  UKB's claim of sovereign power anywhere in the Cherokee Nation Reservation threatens and interferes with the Cherokee Nation's treaty rights and the exercise of those rights and of its inherent sovereign powers, including its treaty-guaranteed right of governance throughout its Reservation within this District.   Additionally, Plaintiff CNB is headquartered in Catoosa, Oklahoma in this District, and the threat of illegal competition from UKB class II gaming affects its operations and business in this District.  Venue is also

12

165345-1

appropriate under 28 U.S.C. § 1391(b)(1) because several of the named Defendants reside in this District, and all Defendants are residents of Oklahoma.

### III.    LEGAL AND FACTUAL ALLEGATIONS

#### A.    Background History of the Cherokee Nation

34.    The Cherokee Nation is a federally-recognized Indian tribe located in what is now Oklahoma.  The Cherokee Nation exercises governmental authority and jurisdiction within a Reservation that was established for it by the United States.  *See generally McGirt v. Oklahoma*, 140 S. Ct. 2452, 2462-65 (2020) (rejecting claim that Muscogee (Creek) Nation Reservation had been disestablished); *Hogner*, No. CF-2015-263 and cases cited in ¶ 7, *supra* (applying *McGirt* to Cherokee treaties and statutes and concluding that the Cherokee Nation Reservation had not been disestablished).  The capital of the Cherokee Nation is located in Tahlequah, Oklahoma.  The Cherokee Nation Reservation includes all or part of the following fourteen counties in Oklahoma: Washington, Wagoner, Tulsa, Nowata, Rogers, Craig, Ottawa, Mayes, Delaware, Cherokee, Adair, Muskogee, McIntosh, and Sequoyah.  More than 141,000 Cherokee Nation citizens reside on the Reservation.

35.    The Cherokee Nation raises governmental revenue from a number of sources, including gaming facilities that it operates on the Cherokee Nation Reservation in compliance with the terms of IGRA.  The Nation operates nine gaming facilities on its Indian lands in Oklahoma, located in South Coffeyville, Grove, Ramona, West Siloam Springs, Claremore, Catoosa, Roland, Sallisaw, and Tahlequah.

13

36.     Pursuant to IGRA, the Nation uses revenues that it earns from the conduct of gaming to fund governmental operations on its Reservation.  These include, among other governmental services: a tribal health system that provides healthcare throughout the Cherokee Nation, with 1.3 million visits a year; a housing authority that provides low-income rental housing, housing assistance, college housing, and housing rehabilitation for Cherokee Nation citizens; the Cherokee Nation Marshal Service, which provides law enforcement services throughout the Reservation both pursuant to the Cherokee Nation's inherent sovereign authority and through cross-deputization agreements with local governments; a Tax Commission that offers car tags to Cherokee Nation citizens residing in Oklahoma; the Charles L. Head ONE FIRE Against Violence Victim Services Office, which provides services for victims of major crimes or abuse; an Indian Child Welfare office that provides child support and protective services for Cherokee children and their families; an Emergency Management team that responds to disasters and emergencies in the Reservation; an Education Services division that operates a Cherokee language immersion charter school, a high school for Indian children, Head Start programs, youth camps and leadership programs, and a Johnson-O'Malley program to fund the education of Indian children enrolled in public schools; and affordable childcare services for Cherokee Nation citizens.

37.     The Cherokee Nation originally held dominion over what is now much of the southeastern United States, and by the eighteenth century was primarily located in North and South Carolina, Tennessee, and Georgia.  By the early 19th century, the Cherokee

165345-1

Nation was under extreme pressure from the intrusion of Anglo-American settlers into its territory.

38.     The United States originally encouraged "voluntary removal" of the Cherokee people to lands in what is now Arkansas.  And, in fact, a small number of Cherokee – who came to be known as the "Old Settlers" – did relocate to Arkansas in the first decade of the 19th century.  The voluntary removal policy was first codified in the Cherokee Treaty of 1817, July 8, 1817, 7 Stat. 156, made with representatives of Cherokee in both the east and the west.  Under the 1817 Treaty the "chiefs, head men, and warriors, of the whole Cherokee nation," ceded lands in the east, *see id.* arts. 1, 2, in exchange for "as much land . . . as [the United States] have or may hereafter receive from the Cherokee nation east of the Mississippi, acre for acre, as the just proportion due to that part of the nation [in the west] agreeably to their numbers," *id.* art. 5.

39.     However, western movement by white settlers continued even into Arkansas, putting new pressure on the Cherokee that had moved west to Arkansas.  In 1828 the United States signed a cession treaty with the "Chiefs and Head Men of the Cherokee Nation of Indians, West of the Mississippi, they being duly authorized and empowered by their Nation," *see* Treaty of 1828, May 6, 1828, 7 Stat. 311, under which the Cherokee Nation ceded the lands in Arkansas on which the Old Settlers resided, *id.* art. 1, in exchange for a territory in what is now Oklahoma, *id.* art. 2, and under which the Old Settlers would remove to the land in Oklahoma.  By supplementary agreement in 1833, the western Cherokee, again "duly authorized and empowered by their nation," adjusted the 1828

15

boundaries in light of a dispute with the Creek and ceded any lands in Oklahoma the Nation acquired in 1828 that were outside of the new 1833 treaty boundaries.  *See* Treaty of Fort Gibson art. 2, Feb. 14, 1833, 7 Stat. 414.

40.    The Cherokee Nation remaining in the east also faced pressure to remove.  In 1835, the United States commissioners signed a treaty with representatives of a faction of the Cherokee Nation at New Echota, Georgia, *see* Treaty of New Echota, Dec. 29, 1835, 7 Stat. 478, under which the Treaty Party purported to, on behalf of the entire Cherokee Nation, cede Cherokee lands east of the Mississippi River, *id.* art. 1, in exchange for the lands promised in the Treaty of 1828 and other lands west of the Mississippi, which would be "a permanent home for themselves and their posterity," *id.* pmbl., and would be "included in one patent executed to the Cherokee nation of Indians by the President of the United States according to the provision of the Act of May 28 1830 [ch. 148, 4 Stat. 411]," *id.* arts. 2, 3.

41.    Despite protest by some Cherokee, the United States Senate ratified the Treaty of New Echota and it went into effect.  Most of the Cherokee Nation refused to remove voluntarily under its terms.

42.    The United States then determined to forcibly remove the Cherokee Nation to the land in Oklahoma.  In May 1838, the United States Army drove the Cherokee out of their homes in Georgia, Tennessee, North Carolina, and Alabama, and into concentration camps at Ross's Landing near Chattanooga and the old Cherokee Agency in Tennessee, where thousands died from disease.  The Cherokee prisoners were then forced in October

165345-1

1838 to travel by foot or riverboat to Fort Gibson, in what is now Oklahoma, where they arrived between mid-January and March 1839.  This journey—the Trail of Tears—was undertaken in circumstances of extreme deprivation in which hundreds died, and about a thousand deserted, to fates unknown.

43.    Despite all this, "[o]n the far end of the Trail of Tears was a promise." *McGirt*, 140 S. Ct. at 2459.  That is, the United States had, in the Treaty of New Echota,

> covenant[ed] and agree[d] that the lands ceded to the Cherokee nation in [Article 2] shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory. But they shall secure to the Cherokee nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them: provided always that they shall not be inconsistent with the constitution of the United States and such acts of Congress as have been or may be passed regulating trade and intercourse with the Indians . . . .

Treaty of New Echota art. 5.  These provisions promised the Cherokee Nation, "[i]n many respects . . . virtually complete sovereignty over their new lands."  *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 635 (1970) (citing *Atl. & Pac. R.R. Co. v. Mingus*, 165 U.S. 413, 435-36 (1897)).  As the Supreme Court said with regard to similar terms in the treaty by which the United States ceded lands to the Creek Nation, this provision "promised not only a 'permanent home'" but also "assured a right to self-government on lands that would lie outside both the legal jurisdiction and geographic boundaries of any State.  Under any definition, this was a reservation."  *McGirt*, 140 S. Ct. at 2461-62.  That Reservation has never been disestablished, and still exists today as the Cherokee Nation Reservation.  *See Hogner*, No. CF-2015-263 and cases cited in ¶ 7, *supra*.  All the land within the Cherokee

Nation Reservation is the Cherokee Nation's Indian country.  *See* 18 U.S.C. § 1151(a); *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 (1998) (citing *DeCoteau v. Dist. Cty. Ct.*, 420 U.S. 425, 427 n.2 (1975)).

44.     The Old Settlers were already on that Reservation when the main body of the Cherokee Nation arrived in Oklahoma, and internal disputes arose between the two groups. After extended negotiations and efforts, including an initial Act of Union in 1839 and the adoption of a new constitution, and another Act of Union in 1840, the Cherokee Nation eventually entered into a treaty with the United States that resolved these internal disputes. Treaty with the Cherokee of 1846, Aug. 6, 1846, 9 Stat. 871.  That treaty provided that "the lands now occupied by the Cherokee Nation shall be secured to the whole Cherokee people for their common use and benefit; and a patent shall be issued for the same."  *Id.* art. 1. Furthermore, the parties agreed that

> [a]ll difficulties and differences heretofore existing between the several parties of the Cherokee Nation are hereby settled and adjusted, and shall, as far as possible, be forgotten and forever buried in oblivion.  All party distinctions shall cease, except so far as they may be necessary to carry out this convention or treaty.

*Id.* art. 2.  The parties also agreed that

> under the provisions of the treaty of 1828, as well as in conformity with the general policy of the United States in relation to the Indian tribes, and the Cherokee Nation in particular, that that portion of the Cherokee people known as "Old Settlers" or "Western Cherokees," had no exclusive title to the territory ceded in [the 1828 Treaty], but that the same was intended for the use of, and to be the home for, the whole nation, including as well that portion then east as that portion then west of the Mississippi . . . .

*Id.* art. 4.

18

45.     This treaty conclusively and permanently resolved the dispute within the Cherokee Nation, and settled beyond question that the Cherokee Nation was thenceforth unified as one political nation, that the Old Settlers were not a separate political entity, and that all lands that had been ceded to the Cherokee Nation by the United States were held by the Cherokee Nation as a whole, not by the Old Settlers alone or by any other portion of Cherokee Nation citizens.  The Supreme Court explained the effect of the 1846 Treaty in these terms:

> [The 1846 Treaty] declared that all difficulties and difference existing between the several parties of the Cherokee nation were settled and adjusted, and that they should, as far as possible, be forgotten and forever buried in oblivion; that all party distinctions should cease, except so far as they might be necessary to carry the treaty into effect; that a general amnesty should be proclaimed; and that all offenses and crimes committed by a citizen or citizens of the Cherokee nation against the nation or an individual were pardoned. It was agreed also that all parties were to unite to enforce laws against future of offenders, and that laws should be passed for equal protection and for security of life, liberty, and property. Thus the personal dissensions were to a great extent healed. *The treaty also declared that the lands occupied by the Cherokee nation should be secured to the whole Cherokee people for their common use and benefit*, and that a patent should be issued for the same, including the 800,000 acres purchased, together with an outlet west, *thus recognizing that all the lands ceded by the United States for the benefit of the Cherokees west of the Mississippi belonged to the entire nation, and not to any of the factions into which the nation was divided.*

*E. Band of Cherokee Indians v. United States*, 117 U.S. 288, 306-07 (1886) (emphasis added).

46.     Reviewing the history of removal and the dispute between the Old Settlers and the Cherokee who later removed in the 1830s, the Supreme Court has conclusively determined that the Western Cherokee (or Old Settlers) were a part of the Cherokee Nation

19

165345-1

and never owned land separate from the Cherokee Nation.  *See United States v. 'Old Settlers'*, 148 U.S. 427 (1893).  In that case, petitioners who claimed that they were descendants and representatives of the Old Settlers pursued claims against the United States under a special jurisdictional act for the taking of the Cherokee lands west of the Mississippi in the 1828 Treaty.  *Id.* at 428-29.  The Supreme Court found that the 1846 Treaty had settled any claim that the Old Settlers had independence from, or a separate identity from, the Cherokee Nation.  *Id.* at 471.  The Court found:

> Upon the facts in the record we can discover no ground for the revival of controversy by the Western Cherokees as to their ownership of or rights in the lands west of the Mississippi, and hold that any such claim in respect thereof as is put forward in the petition cannot be successfully maintained from any point of view.  If any matter ever can be put at rest, that has been, and the treaty of 1846 has presented for nearly 50 years an insuperable bar to such a contention.

*Id.*  Furthermore, the Court rejected the notion that the "Old Settlers" were an independent political community from the Cherokee Nation at the time the 1846 Treaty was signed: "The Western Cherokees were paid, under the Treaty of 1846, simply as citizens of the Cherokee nation, entitled to receive the money, as having emigrated prior to 1835, or the descendants of such." *Id.* at 479.

47.    The outbreak of the Civil War also affected the Cherokee Nation by causing new internal disputes.  The Treaty of Washington, which the United States and the Cherokee National Council delegates signed on July 19, 1866, 14 Stat. 799, settled the Civil War issues within the Cherokee Nation.  *See* Treaty of Washington signature page (listing "Delegates of the Cherokee Nation, appointed by Resolution of the National

Council").  In the Treaty, the Cherokee Nation renounced its former alliance with the Confederacy and reaffirmed the abolition of slavery, 1866 Treaty arts. 1, 9, ceded substantial lands to the United States, *id.* art. 17, agreed to the sale of other lands, *id.* art. 16, and agreed to allow other tribes to settle on its Reservation, but only when that was done with the Cherokee Nation's further consent, *id.* art. 15.  The Treaty also provided that any remaining Cherokee lands in Arkansas could be sold by the Cherokee Nation's National Council, with approval of the Secretary of the Interior.  *Id.* art. 18.  Finally, the Treaty provided that:

> All provisions of treaties heretofore ratified and in force, and not inconsistent with the provisions of this treaty, are hereby re-affirmed and declared to be in full force; and nothing herein shall be construed as an acknowledgment by the United States, or as a relinquishment by the Cherokee Nation of any claims or demands under the guarantees of former treaties, except as herein expressly provided.

*Id.* art. 31.  This reiterated and ratified the Cherokee Nation's right to self-government on its Reservation guaranteed by the 1835 Treaty of New Echota.

48.     The Cherokee Nation has since continued to exercise its inherent sovereign powers within its Reservation in Oklahoma, through its government and laws.  In 1976, the Nation exercised its inherent powers of self-government to reorganize its government under a new Constitution.  It continues to operate under an elected government, providing public and governmental services to its citizens and the residents of the Reservation, and continuing the longstanding government-to-government relationship between the United States and the Cherokee Nation.  As Congress has recognized,

21

> The Cherokee Nation, a federally recognized Indian tribe with its present tribal headquarters south of Tahlequah, Oklahoma, having adopted its most recent constitution on June 26, 1976, and having entered into various treaties with the United States, including but not limited to the Treaty at Hopewell, executed on November 28, 1785 (7 Stat. 18), and the Treaty at Washington, D.C., executed on July 19, 1866 (14 Stat. 799), has maintained a continuous government-to-government relationship with the United States since the earliest years of the Union.

Cherokee, Choctaw, and Chickasaw Nations Claims Settlement Act, Pub. L. No. 107-331, tit. VI, § 602(3), 116 Stat. 2834, 2845 (2002).

49.     As a result of the 1835 and 1866 treaty guarantees by the federal government to the Cherokee Nation, the assertion of sovereign authority over land within the Reservation by another tribe—such as UKB—"directly attacks the sovereignty of the Cherokee Nation" over that land.  *United Keetoowah Band of Cherokee Indians v. Mankiller*, 2 F.3d 1161, 1993 WL 307937, at *4 & n.1 (10th Cir. 1993) (citing *EEOC v. Cherokee Nation*, 871 F.2d 937, 937-38 (10th Cir. 1989)).

**B.     Background History of the UKB**

50.     In the 1930s, several groups of Cherokees who identified themselves with a historic organization of Cherokees known as the Keetoowah Society asked the Department of the Interior if they could organize as a tribe or band under the Oklahoma Indian Welfare Act (OIWA), Act of June 26, 1936, 49 Stat. 1967.

51.     In 1937, the Oklahoma Regional Coordinator in charge of tribal organization inquired of the Solicitor of the Department of the Interior whether the "Keetoowah Society of Oklahoma Cherokees can be considered a band for purposes of organization under [OIWA]."  Op. Sol. Interior July 29, 1937.  The Solicitor noted that "[d]ue to differences

22

in philosophy the society is now divided into six factions."  He concluded that "neither the Keetoowah Society nor any of its factions can be considered a band, much less a 'recognized band' under section 3 of [OIWA]," because none of them were "a political body" with "the functions and powers of government."  The Keetoowah Society, the Solicitor found, "is neither historically nor actually a governing unit of the Cherokee Nation, but a society of citizens within the Nation with common beliefs and aspirations." In 1946, the Acting Secretary of the Interior repeated this conclusion to Congress, stating that the Solicitor of the Department of the Interior had made this determination because "it seemed impossible to make a positive finding that the Keetoowah Indians were and are a tribe or band within the meaning of the Oklahoma Indian Welfare Act."  Letter from Abe Fortas, Acting Sec'y of Interior, to Henry M. Jackson, Chairman, Comm. On Indian Affairs, U.S. House of Reps. (Mar. 24, 1945), *reprinted in* H.R. Rep. No. 79-447, at 2 (1945).

52.     The Keetoowah factions then sought legislation that would allow them to organize as a tribe under the OIWA.  In 1946 Congress enacted this single sentence in the Act of August 10, 1946, ch. 947, 60 Stat. 976: "That the Keetoowah Indians of the Cherokee Nation of Oklahoma shall be recognized as a band of Indians residing in Oklahoma within the meaning of section 3 of [the OIWA]."  *Id.* § 1.  The Act of August 10, 1946 did not establish a reservation for UKB, nor did the Act indicate or imply that UKB had any jurisdiction or authority over the Cherokee Nation Reservation or enjoy any

23

rights or interest in the Cherokee Nation's treaty or property rights. Nor did the President or the Secretary of the Interior ever issue an order establishing a reservation for UKB.

53.     The "Keetoowah Indians of the Cherokee Nation of Oklahoma" organized in 1950 under the terms of the Oklahoma Indian Welfare Act, as the United Keetoowah Band of Cherokee Indians in Oklahoma. The same year, UKB also chartered the UKB Corporation under federal law.

54.     Until 2020, the federal government did not hold any land in trust for UKB, nor did UKB hold any land in restricted fee status. In 2020, the United States took into trust for the UKB Corporation for the benefit of UKB a 76-acre parcel of land, and this is the only land which the federal government has ever held in trust for the benefit of UKB. This land was not taken into trust for gaming purposes and, under IGRA, is not eligible for gaming since it was acquired in trust after 1988 without meeting the requirements for gaming on such "after-acquired" trust land. 25 U.S.C. § 2719(a).

55.     As this Court has concluded, "No reservation has ever been established by treaty, Executive Order, or Secretarial Order for the UKB tribe." *Bernhardt*, 2020 WL 1429946, at *10. The United States has never taken any action to establish a UKB Reservation, or to establish the Cherokee Nation Reservation as a UKB Reservation, or to provide UKB with an interest in the Cherokee Nation Reservation. UKB therefore has never had a reservation, does not have one today, and does not have a former reservation in Oklahoma.

165345-1

### C.     Cherokee Nation Gaming Laws

56.     The Cherokee Nation has "virtually compete sovereignty," *Choctaw Nation*, 397 U.S. at 635, over its Reservation pursuant to Article 5 of the 1835 Treaty of New Echota, by which the United States:

> covenant[ed] and agree[d] that the lands ceded to the Cherokee nation in [Article 2 of the Treaty of New Echota] shall, in no future time without their consent, be included within the territorial limits or jurisdiction of any State or Territory. But they shall secure to the Cherokee nation the right by their national councils to make and carry into effect all such laws as they may deem necessary for the government and protection of the persons and property within their own country belonging to their people or such persons as have connected themselves with them.

That right of complete sovereignty was reaffirmed by the 1866 Treaty of Washington, art. 31.  The entirety of the Cherokee Nation Reservation is under the "jurisdiction" of the Cherokee Nation, and the Reservation constitutes the "Indian lands" of the Cherokee Nation.  25 U.S.C. § 2703(4)(A).

57.     The Cherokee Nation exercised its sovereign treaty right of self-government and its rights under IGRA when it enacted and then later amended the Cherokee Nation Tribal Gaming Act, 4 CNCA § 1 *et seq.*, most recently in 2014, which was approved by the NIGC in accordance with federal law, *see* Letter from Jonodev Chaudhuri, Acting Chairman, NIGC, to Bill John Baker, Principal Chief, Cherokee Nation (Oct. 27, 2014), and when it enacted its Criminal Code, CNCA tit. 21.

58.     The Gaming Act establishes a Cherokee Nation Gaming Commission and gives it the authority to issue class II gaming licenses within the Cherokee Nation Reservation.  4 CNCA §§ 20, 22(A), 30(B).  The Cherokee Nation Gaming Commission

165345-1

can issue class II gaming licenses only to wholly-owned tribal enterprises of the Cherokee Nation or its designated or approved agent or employee. *Id.* § 34. All the Cherokee Nation's wholly-owned tribal enterprises that conduct gaming are operated by CNB through its subsidiary company Cherokee Nation Entertainment, LLC (CNE), and CNE is the only entity to which the Cherokee Nation Gaming Commission has issued class II gaming licenses. The Gaming Ordinance further provides that "[c]onducting gaming operations without the lawful written approval and licensure of the Gaming Commission is a crime," with enforcement authority exercised by the Cherokee Nation Attorney General and Marshal Service. *Id.* § 30(D).

59. The Cherokee Nation criminal code provides that any person who "opens, or causes to be opened, or who conducts, whether for hire or not, or carries on . . . any gambling game played with . . . any device, for money, checks, credits, or any representatives of any value . . . shall be guilty of a crime," 21 CNCA § 941, unless that gambling game is being operated by the Cherokee Nation pursuant to the licensing and regulation of the Cherokee Nation Gaming Commission, *id.* § 978.

60. UKB's proposed licensing and conduct of gaming is not licensed by the Cherokee Nation. UKB's proposed licensing and conduct therefore violates Cherokee Nation law, and the licensing, conduct, and regulation of such gaming by UKB interferes with the Cherokee Nation's right to govern the Cherokee Nation Reservation according to its laws and constitutes illegal competition with CNB.

**D.      Indian Gaming Regulatory Act**

61.      Enacted in 1988, IGRA "provided a comprehensive system to regulate gambling activities on Indian lands." *United States v. Seminole Nation of Okla.*, 321 F.3d 939, 941 (10th Cir. 2002).

62.      IGRA "provide[s] a statutory basis for [both] the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments," 25 U.S.C. § 2702(1), and "the regulation of gaming by an Indian tribe adequate to shield it from organized crime and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator and players," *id.* § 2702(2).

63.      IGRA requires that tribes be the primary beneficiaries of tribal gaming, *id.* § 2702(2); that tribes "have sole proprietary interest and responsibility for the conduct of any gaming activity," *id.* § 2710(b)(2)(A), (d)(1)(A)(ii); and that tribal gaming revenues be used only to fund tribal government operations and programs, to provide for the general welfare of the tribe, to promote tribal economic development, and for charitable and local governmental purposes, *id.* § 2710(b)(2)(B), (d)(1)(A)(ii).  In other words, gaming is a governmental activity by Indian tribes, in which they engage to raise revenue to fund governmental operations and promote tribal self-sufficiency. *See Bay Mills*, 572 U.S. at 810 (Sotomayor, J., concurring).

165345-1

64.     IGRA divides gaming into three classes: "Class I games (social games solely for prizes of minimal value or traditional forms of Indian gaming); Class II games (bingo, including pull-tabs, lotto, punch boards, tip jars, instant bingo, other games similar to bingo, and certain card games); and Class III games (all other gaming)." *Seminole Nation*, 321 F.3d at 941 (citing 25 U.S.C. § 2703(6)-(8)).

65.     IGRA provides for class II gaming by a tribe only on "Indian lands *within such tribe's jurisdiction*." 25 U.S.C. § 2710(b)(1) (emphasis added).  Under IGRA "Indian lands" are defined as follows:

> (A) all lands within the limits of any Indian reservation; and (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

*Id.* § 2703(4).   Under Section 2703(4)(A), an Indian tribe can only conduct, license, or regulate Class II gaming on Indian lands *within its reservation.  See Seneca-Cayuga Tribe of Okla. v. Nat'l Indian Gaming Comm'n*, 327 F.3d 1019, 1023 (10th Cir. 2003); *see also Oklahoma v. Hobia*, 775 F.3d 1204, 1211 (10th Cir. 2014) (discussing IGRA requirement that tribe must have jurisdiction over Indian lands to conduct Class III gaming on those lands).

66.     IGRA further provides that:

> (1) An Indian tribe may engage in, or license and regulate, class II gaming on Indian lands within such tribe's jurisdiction, if—

> > (A) such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity (and

28

such gaming is not otherwise specifically prohibited on Indian lands by Federal law), and

(B) the governing body of the Indian tribe adopts an ordinance or resolution which is approved by the Chairman [of the National Indian Gaming Commission].

A separate license issued by the Indian tribe shall be required for each place, facility, or location on Indian lands at which class II gaming is conducted.

25 U.S.C. § 2710(b).

67.     Under 25 C.F.R. § 559.2(a), a tribe that intends to issue a gaming license must provide the Chairman of the NIGC with 120 days' notice of the intent to issue the license.

**E.     UKB's Gaming and Licensing Activities**

68.     On August 19, 2020, Defendant Thompson, on behalf of UKB, submitted a notification to the NIGC pursuant to 25 C.F.R. § 559.2(a) that UKB intends to issue a gaming license for a new class II gaming facility that it will own, operate and regulate in Tahlequah, Oklahoma.  *See* Ex. 1 (Letter from Jamie Thompson, Chairman, UKB Corp. Bd., to E. Sequoyah Simermeyer, Chairman, NIGC (Aug. 19, 2020)).

69.     According to the notification sent to the NIGC, the UKB facility will be located at the River Brewhouse, which is located within the Cherokee Nation Reservation and next to the 2.03-acre parcel at issue in the *Bernhardt* decision issued by this Court.  A map of the property is attached as Ex. 2.  Additionally, a billboard posted next door to the River Brewhouse property pictures a structure with a "Casino" sign on it, and in large letters says, "NEW PROJECT" and "COMING SOON…."  A photo of this sign is attached as Exhibit 3, and its location is shown on the map attached as Exhibit 2.

29

165345-1

70.     The River Brewhouse site on which the UKB gaming operation is located is not within a UKB reservation or former reservation, nor is it held in trust or subject to a restriction against alienation.  Thus, the parcel of land is not within the "jurisdiction" of UKB and it does not qualify as UKB "Indian lands" on which UKB can conduct gaming under IGRA.  Accordingly, it would violate federal law for UKB to license, conduct, or regulate class II gaming on the River Brewhouse site.  The same is true of the adjacent 2.03-acre parcel.

71.     UKB also lacks an operative class II gaming ordinance, which IGRA requires an Indian tribe to have in order to conduct gaming.  25 U.S.C. § 2710(b)(1)(B).  The NIGC conditionally approved UKB's existing tribal gaming ordinance in 1995, but it provided that "the gaming ordinance is approved for gaming only on Indian lands as defined in the IGRA."  Ex. 4, Letter from Harold A. Monteau, Chairman, NIGC, to John Ross, Chief, UKB (Mar. 22, 1995).  Because the NIGC concluded that "the Band does not have *any* lands that meet that definition," it stipulated that "until such time as it is determined that the Band holds lands that meet the definition in the IGRA, the Band is *not authorized* to conduct class II or class III gaming."  *Id.* (emphases added).

72.     The NIGC reiterated its 1995 conclusion in a 2011 Indian Lands Opinion, which the NIGC issued regarding the 2.03-acre piece of land owned by UKB that is located immediately adjacent to the River Brewhouse and which is the subject of the *Bernhardt* litigation.  *See* Ex. 5, Mem. from Lawrence S. Roberts, Gen. Counsel, NIGC, to Tracie Stevens, Chairwoman, NIGC (July 18, 2011).  In that 2011 Indian Lands Opinion, NIGC

165345-1

stated that "[t]he gaming ordinance contained no information about any specific site, and the NIGC Chairman was careful to make clear that the ordinance approval was not tantamount to approval of gaming activities on any particular site." *Id.* at 7.  The NIGC further clarified that "[t]he approval was an explicit finding by the NIGC Chairman in an agency action . . . and it set forth the agency's view that the UKB had no Indian lands. . . . The Chairman's finding was not appealed to the full Commission or to a federal district court." *Id.*  The NIGC concluded that "[u]ntil that [finding] changed, the UKB was not authorized to conduct Class II or Class III gaming." *Id.*  In the *Bernhardt* case, this Court enjoined the Secretary of Interior from taking the 2.03-acre parcel into trust for gaming purposes by UKB.  2020 WL 1429946 at *13.  Thus, the legal status of this site is unchanged from its status at the time of the 2011 NIGC Indian Lands Opinion.  The River Brewhouse site is identically situated as a matter of law to the site that was the subject of the Indian Lands Opinion, and therefore the same conclusion applies: that UKB does not have an operative gaming ordinance with regard to this site and is not authorized to conduct gaming on this site.

73.    Actions taken by UKB's officers to license, conduct and regulate class II gaming on the Cherokee Nation Reservation will create illegal competition by UKB gaming enterprises with the Cherokee Nation's and CNB's gaming enterprises in the highly competitive Oklahoma gaming market.  Such illegal competition will place the Cherokee Nation and CNB, which do follow IGRA, at a competitive disadvantage and will reduce the Nation's gaming revenues, which it uses to fund its governmental services on the

165345-1

Reservation.  That threatens the Nation's right to conduct IGRA gaming "as a means of promoting tribal economic development, self-sufficiency, and strong tribal government[]." 25 U.S.C. § 2702(1).  These injuries are directly traceable to the Defendants' conduct in purporting to license, regulate, and conduct class II gaming in violation of IGRA and in violation of Cherokee law, and its unlawful interference with the exercise of the Cherokee Nation's sovereign authority and rights protected by its treaties with the United States.

## IV.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**THE DEFENDANTS' CONDUCT VIOLATES THE CHEROKEE NATION'S LAWS AND THE CHEROKEE NATION'S RIGHT TO SOVEREIGNTY ON THE CHEROKEE NATION RESERVATION, WHICH IS GUARANTEED BY TREATIES WITH THE UNITED STATES.**

74.     The Nation incorporates all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

75.     The Defendants' actions to license, conduct, and regulate gaming on fee lands on the Cherokee Nation Reservation, and to assert that there is a UKB reservation, constitute a violation of the Cherokee Nation's treaty-protected jurisdiction and authority over gaming activities on the Cherokee Nation Reservation.  The Defendants' imminent actions will violate Cherokee Nation law.  The Defendants' actions, taken in violation of the Cherokee Nation's laws, interfere with the Cherokee Nation's right to govern its Reservation, which is guaranteed by the 1835 Treaty of New Echota and the 1866 Treaty of Washington.

76.     For the reasons described above, the Nation is entitled to a declaratory judgment that Defendants' actions violate federal law and an injunction forbidding Defendants from licensing, conducting, or regulating gaming within the Cherokee Nation Reservation.

## SECOND CAUSE OF ACTION

### THE DEFENDANTS' ACTIONS TO LICENSE, CONDUCT, AND REGULATE GAMING AT THE RIVER BREWHOUSE SITE VIOLATE IGRA BECAUSE THAT SITE DOES NOT CONSTITUTE UKB INDIAN LANDS.

77.     The Nation incorporates all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

78.     The River Brewhouse parcel and the 2.03-acre parcel do not constitute UKB Indian lands as that term is defined by IGRA.

79.     The Defendants' actions purporting to have the authority to license, conduct and regulate gaming at the River Brewhouse parcel or the 2.03-acre parcel are therefore contrary to IGRA, are unlawful, and constitute continuing violations of federal law.

80.     For the reasons described above, the Nation is entitled to a declaratory judgment that Defendants' actions violate federal law and to an injunction forbidding Defendants from licensing, conducting, or regulating gaming at the River Brewhouse parcel or the 2.03-acre parcel.

165345-1

**THIRD CAUSE OF ACTION**

**THE DEFENDANTS' ACTIONS TO LICENSE AND CONDUCT GAMING AT THE RIVER BREWHOUSE SITE AND 2.03-ACRE PARCEL VIOLATE IGRA BECAUSE UKB LACKS AN OPERATIVE GAMING ORDINANCE FOR GAMING AT THAT SITE.**

81.     The Nation incorporates all previous allegations of fact and law into this Cause of Action as if fully set forth herein.

82.     UKB does not have an operative gaming ordinance as required by IGRA to conduct gaming on the River Brewhouse parcel or the 2.03-acre parcel because they do not constitute UKB Indian lands as that term is defined by IGRA.

83.     The Defendants' actions purporting to have the authority to license, conduct, and regulate gaming at the River Brewhouse parcel or the 2.03-acre parcel are therefore contrary to IGRA, are unlawful, and constitute continuing violations of federal law.

84.     For the reasons described above, the Nation is entitled to a declaratory judgment that Defendants' actions violate federal law and to an injunction forbidding Defendants from licensing, conducting, or regulating class II gaming at the River Brewhouse parcel or the 2.03-acre parcel.

## V.     PRAYER FOR RELIEF

WHEREFORE, the Cherokee Nation respectfully prays for a judgment in its favor as follows:

1.     The Cherokee Nation seeks a declaration that:

(a)     Defendants are violating the Cherokee Nation's rights to self-government on the Cherokee Nation Reservation held under the 1835 Treaty of New

34

165345-1

Echota and the 1866 Treaty of Washington by asserting there is a UKB reservation and purporting to license, conduct or regulate gaming on the Cherokee Nation Reservation in violation of the Cherokee Nation's laws.

(b)     Defendants have no authority, right, or power to license, conduct, or regulating gaming on the Cherokee Nation Reservation.

(c)     Defendants are violating IGRA by purporting to license, conduct, or regulate gaming at the River Brewhouse parcel or on the 2.03-acre parcel on the Cherokee Nation Reservation because those parcels do not constitute UKB "Indian lands" as defined by IGRA.

(d)     Defendants are violating IGRA by purporting to license, conduct, or regulate gaming at the River Brewhouse parcel or the 2.03-acre parcel on the Cherokee Nation Reservation because UKB has no operative gaming ordinance approved by the NIGC to conduct gaming at those sites.

2.     The Nation seeks an injunction prohibiting Defendants from conducting, licensing, or otherwise regulating gaming at the River Brewhouse parcel or the 2.03-acre parcel on the Cherokee Nation Reservation.

3.     Such other and further relief that this Court deems proper.

//

//

//

//

35

165345-1

Respectfully submitted,

Dated: November 20, 2020    By:  */s/ Sara Hill*
Sara Hill, OK Bar # 20072
   *Attorney General*
Chrissi Nimmo, OK Bar # 22248
   *Deputy Attorney General*
Leslie Mariah Thompson, OK Bar # 30753
   *Assistant Attorney General*
P.O. Box 1533
Tahlequah, OK 74465
Phone no.: 918-207-3836
Fax no.: 918-458-6142
E-mail:   sara-hill@cherokee.org
         chrissi-nimmo@cherokee.org
         mariah-thompson@cherokee.org

*/s/ Frank S. Holleman*
Lloyd B. Miller, DC Bar # 317131
Donald J. Simon, DC Bar # 256388
   (application for admission *pro hac vice*
   forthcoming)
Frank S. Holleman, DC Bar # 1011376
K. Amanda Saunders, AK Bar # 2007066
   (application for admission *pro hac vice*
   forthcoming)
Sonosky, Chambers, Sachse,
   Endreson & Perry, LLP
1425 K Street, NW, Suite 600
Washington, DC 20005
Phone no.: 202-682-0240
Fax no.: 202-682-0249
E-mail:   lloyd@sonosky.net
         dsimon@sonosky.com
         fholleman@sonosky.com
         amandas@sonosky.net

*Counsel for the Plaintiffs*

165345-1