# Exhibit 5



## MEMORANDUM

TO: Tracie Stevens, Chairwoman

FROM: Lawrence S. Roberts, General Counsel
Jo-Ann M. Shyloski, Associate General Counsel—Litigation & Enforcement
Dawn Sturdevant Baum, Staff Attorney

DATE: July 18, 2011

RE: United Keetoowah Band of Cherokee Indians;
Gaming site in Tahlequah, Oklahoma

---

    This memorandum concludes a legal review of whether a gaming facility owned and operated by the United Keetoowah Band of Cherokee Indians in Oklahoma ("United Keetoowah Band" or "UKB") is on Indian lands as defined by the Indian Gaming Regulatory Act ("IGRA") and National Indian Gaming Commission ("NIGC") regulations. This matter was remanded to the NIGC for review by the federal district court in *United Keetoowah Band of Cherokee Indians in Okla. v. Oklahoma*, No. 04-340, 2006 U.S. Dist. LEXIS 97268 (E.D. Okla. Jan. 26, 2006).

    The gaming facility once was called Keetoowah Bingo but is now called the Keetoowah Cherokee Casino. *See* http://www.keetoowahgaming.com/. The gaming facility is located at 2450 South Muskogee Avenue in Tahlequah, Oklahoma ("the Gaming Site").

    As explained below, it is our opinion that the Gaming Site does not qualify as Indian lands under IGRA. Therefore, the NIGC does not have jurisdiction to regulate the gaming activities that take place there. The Department of the Interior ("DOI"), Office of the Solicitor, concurs with this opinion.

## I. Procedural Background

In September 2000, the General Counsel of the NIGC wrote an Indian lands opinion concerning the Gaming Site. Letter from Kevin K. Washburn, NIGC General Counsel, to Jim Henson, UKB Chief (Sept. 29, 2000) ("the September 2000 Letter"). Mr. Washburn concluded that the UKB's gaming activity is not subject to IGRA because the UKB lacked the requisite legal jurisdiction over the Gaming Site for it to qualify as Indian lands. *Id.* at 4-6. The UKB challenged the September 2000 Letter in federal district court.[1] The district court found that because the NIGC "took definite action" to stop regulating the UKB's gaming operation in accordance with the conclusion in the September 2000 Letter, the September 2000 Letter constituted a reviewable final agency action. *United Keetoowah Band*, No. 04-340 at 7 n.4, 10.

The district court set aside the September 2000 Letter as arbitrary and capricious under the Administrative Procedures Act because the NIGC failed to consider important aspects in reaching its conclusion. *Id.* at 10-14. For example, the court determined that when the NIGC has exercised some sort of regulation over a site for some time, the Indian lands determination must go beyond the basic analysis to include consideration of the facts surrounding the past regulation. *Id.* at 12. The court concluded that the administrative record supporting the September 2000 Letter lacked information relating to the early regulation of the gaming site by the NIGC. Further, the September 2000 Letter failed to give any explanation as to the past regulation of the UKB's gaming activities, "including whether the NIGC had, in fact, prior to 2000, ever made any determination that the [Gaming Site] Land was 'Indian land' and if it had not, why the NIGC made the decision to regulate Plaintiff's gaming on the land." *Id.*

In setting aside the September 2000 Letter and remanding the matter to the NIGC, the court ordered the NIGC to "investigate, compile a complete record and consider all relevant factors before making its final determination of whether the [Gaming Site] Land is 'Indian land' as that term is defined by 'IGRA.'" *Id.* at 14.[2] According to the court's order, a complete administrative record in this case should contain, but not be limited to, the following:

---

[1] The NIGC's position in that lawsuit was—and continues to be—that stand-alone legal opinions from the NIGC's Office of General Counsel are not agency actions at all, much less final agency actions subject to judicial review under IGRA, 25 U.S.C. § 2714, or the Administrative Procedures Act ("APA"), 5 U.S.C. § 704. See *Miami Tribe of Okla. v. United States*, 198 F. App'x 686, 689-91 (10th Cir. 2006); *County of Amador v. United States Dept. of the Interior*, No. 07-527, 2007 U.S. Dist. LEXIS 95715, at *10-18 (E.D. Cal. Dec. 13, 2007); *Citizens Against Casino Gambling in Erie County v. Kempthorne*, 471 F. Supp. 2d 295, 327-28 (W.D.N.Y. 2007); *Wyandotte Nation v. NIGC*, 437 F. Supp. 2d 1193, 1201 (D. Kan. 2006); *Cheyenne-Arapaho Gaming Comm'n v. United States*, No. 04-1184, slip op. at 5-9 (W.D. Okla. Dec. 4, 2006); *Cheyenne-Arapaho Gaming Comm'n v. NIGC*, 214 F. Supp. 2d 1155, 1167-72 (N.D. Okla. 2002).

[2] The United States and the State of Oklahoma appealed the district court's order. The United States did not pursue its appeal after a court-ordered mediation process failed to produce a settlement, but the State of Oklahoma did. The Tenth Circuit dismissed the State's appeal for lack of jurisdiction, finding that the remand order was not a final order subject to appeal. *United Keetoowah Band of Cherokee Indians in Okla. v. United States*, No. 06-7033 (10th Cir. Sept. 6, 2007).

- Evidence indicating the status of the UKB's trust application, *id.* at 11;

- Documents and analysis regarding whether the gaming site is within the boundaries of the "original Cherokee territory" in Oklahoma, and if so, evidence as to whether the Cherokee Nation has been "consulted" regarding the UKB's trust application and the results of that consultation, *id.*;

- Evidence regarding whether the UKB has exercised governmental power over the gaming site, *id.*;

- Evidence showing the exact nature and extent of federal regulation over the UKB's gaming activities that took place during the entire period of such regulation, *id.* at 13;

- Documentation of the UKB's tax payments to the State if they were made, and if not, documentation showing why they were not paid, including any collection notices, *id.* at 12; and

- Documents showing whether the Gaming Site is the same property as the land at issue in *Buzzard v. Oklahoma Tax Comm'n*, 992 F.2d 1073 (10th Cir. 1993), *id.*

Upon commencing its review on remand, the NIGC provided notice to five entities: the United Keetoowah Band; the Cherokee Nation; the State of Oklahoma; Cherokee County, Oklahoma; and the City of Tahlequah, Oklahoma. Letter from Penny Coleman, NIGC Acting General Counsel, to potentially interested parties (Nov. 28, 2007). Specifically, the NIGC established a briefing schedule to allow the submittal and exchange of opening memoranda, responses, and replies, all with supporting documentation. *Id.* That briefing schedule was twice extended, first at the request of the UKB and then the State of Oklahoma. Letters from Jeffrey Nelson, NIGC Senior Attorney, to interested parties (Jan. 29, 2008; May 29, 2008). The NIGC received opening, response, and reply briefs, all with supporting materials, from the United Keetoowah Band, the Cherokee Nation, and the State of Oklahoma. Later, the NIGC requested supplemental briefing on whether the Gaming Site was "subject to restriction by the United States against alienation" as that phrase is used within IGRA's definition of *Indian lands*. Letter from Penny Coleman, NIGC Acting General Counsel, to interested parties (July 31, 2009). The NIGC received supplemental briefs addressing this issue from the UKB, the Cherokee Nation, and the State of Oklahoma.

In addition, the NIGC reviewed its own files at both its headquarters and Tulsa region offices, compiling all documents in its possession concerning the UKB's Gaming Site. Finally, the NIGC contacted the Bureau of Indian Affairs and obtained a copy of the administrative record concerning the UKB's trust application.

## II. Facts

We have compiled and reviewed a thorough administrative record, including all documents submitted during the briefing schedule and all other information in the NIGC's possession regarding the UKB's Gaming Site.

### A. Location of the Gaming Site

The Gaming Site is located at 2450 South Muskogee Avenue (U.S. Highway 62) in the City of Tahlequah, Cherokee County, Oklahoma. The legal land description is:

A tract of land lying in and being a part of the S½ NE¼ SE¼ SW¼ and a part of the N½ SE¼ SE¼ SW¼ of Section 4, Twp. 16 N, Rge. 22 E, Cherokee County, Oklahoma, more particularly described as follows, to-wit: Beginning at a point 175.0 feet South of the North boundary and 131.0 feet East of the West boundary of said S½ NE¼ SE¼ SW¼; thence S 2° - 56' W, 159.8 feet; thence N 89° - 12' W, 24.8 feet; thence S 3° - 30' W, 171.4 feet to a point 175.0 feet South of the North boundary of said N½ SE¼ SE¼ SW¼; thence S 89° - 49' E, 384.32 feet to a point on the West boundary of U.S. Highway No. 62; thence N 5° - 25' W, along the West boundary of U.S. Highway No. 62, 332.0 feet; thence N 89° - 49' W, 309.55 feet to the Point of Beginning. Containing 2.63 acres.

Warranty Deed (Jan. 2, 1991); Memorandum from Tim Harper, NIGC Region Director, to Rick Schiff, NIGC Deputy Chief of Staff, re United Keetoowah Land Issue (May 1, 2000); UKB Opening Mem. at 36.

In addition to operating a gaming facility on the Gaming Site, the United Keetoowah Band uses the parcel and contiguous tracts[3] as a tribal complex, which includes the tribal government headquarters, administrative offices, tribal tag office, tribal court system, legal assistance office, tribal realty department, tribal law enforcement office, tribal newspaper, public information office, and the tribal community garden. UKB Opening Mem. at 11, ex. 8 (Affidavit of Charles Locust ("Locust Aff.")).

---

[3] The State has produced two additional deeds that conveyed three small tracts to the UKB. State Opening Mem. at 11, ex. 2, 3. Using satellite image and mapping software, we have determined that these three small tracts are contiguous to the Gaming Site. See Figure 1, below. Nothing in the administrative record or from the collective knowledge of the NIGC's field staff suggests that the UKB is conducting gaming operations on the three contiguous tracts. Moreover, it appears that the United Keetoowah Band conveyed the western contiguous tract to Wal-Mart about 15 years ago. Warranty Deed from United Keetoowah Enterprises Inc. for and in behalf of United Keetoowah Band of Cherokees in Oklahoma, to Wal-Mart Stores Inc. (Nov. 7, 1995). Therefore, the analysis and conclusions in this memorandum are limited to the 2.63-acre Gaming Site.



**Figure 1:** Satellite image of the UKB's tribal complex and vicinity in Tahlequah, Oklahoma. ESRI ArcGIS online service.

There is no dispute that the Gaming Site is located within the exterior boundaries of the former Cherokee Reservation or "original Cherokee territory" in Oklahoma. UKB Opening Mem. at 11, ex. 11 (maps, Historical Atlas of Okla.); *see also* Cherokee Nation's Opening Mem. at 9-10. There is also no dispute that the Gaming Site was *not* among the properties that were at issue in *Buzzard v. Okla. Tax Comm'n*, 992 F.2d 1073 (10th Cir. 1993). *See* UKB Opening Mem. at 12, ex. 12 (Okla. Tax Comm'n Response to Plaintiff's Supplemental Brief, attaching property deeds at issue in *Buzzard*).

### B. History of the Gaming Site

All of Cherokee County, including the Gaming Site, is within the exterior boundaries of the former Cherokee Nation Reservation, created by the United States' Treaty with the Western Cherokee, 7 Stat. 311 (May 6, 1828), and confirmed in the Treaty of New Echota, 7 Stat. 478 (Dec. 29, 1835), which lands were granted to the Tribe in fee simple. *See generally,* Memorandum from M. Sharon Blackwell, DOI Field Solicitor, to DOI Associate Solicitor, re Cherokee Nation of Oklahoma – Trust Acquisition of 15.99 acres, City of Catoosa, Oklahoma, for Gaming Purposes (Sept. 21, 1993) (discussing Cherokee Nation Reservation with reference to attached maps).

In 1902, Congress provided for the allotment of these lands, with each Cherokee citizen to receive an allotment in fee from the Cherokee Nation. 32 Stat. 716 (July 1, 1902). Each allotment was to include a smaller homestead parcel that was identified by a separate homestead certificate and was to be nontaxable and inalienable during the lifetime of the allottee, but not exceeding 21 years from the date of the certificate of allotment. *Id.* § 13. Consequently, Department of Interior decisions and federal court opinions refer to this territory as a "former reservation." See *United Keetoowah Band of Cherokee Indians v. Director, Eastern Oklahoma Region, Bureau of Indian Affairs*, Decision of the Assistant Secretary – Indian Affairs (June 24, 2009); *Buzzard v. Oklahoma Tax Comm'n*, 992 F.2d 1073, 1076-77 (10th Cir.1993).

In 1905, a Cherokee citizen named Albert Payne received a homestead certificate for 30 acres of land that included the future Gaming Site. Homestead Certificate to Albert Payne (approved May 24, 1905). In 1908, Congress enacted a statute that removed certain restrictions on the allotments and homesteads held by Cherokee citizens. 35 Stat. 312 (May 27, 1908). Pertinent to this analysis, the statute provided: "All lands, including homesteads, of said allottees enrolled as intermarried whites, as freedmen, and as mixed-blood Indians having less than half Indian blood including minors shall be free from all restrictions." *Id.* Albert Payne was recorded in the Dawes Rolls as a Cherokee citizen (#14,315) of ⅛ Indian blood. Index to the Final Rolls of Citizens and Freedmen of the Five Civilized Tribes in Indian Territory, Prepared by the Commission and Commissioner to the Five Civilized Tribes and Approved by the Secretary of the Interior at 326 (March 4, 1907). Therefore, the 1908 statute removed all restrictions on the Payne homestead allotment. Three months later, Payne conveyed his 30-acre allotment in fee simple to a woman named Emma Rinks of Tahlequah. A general warranty deed was recorded by the Cherokee County Register of Deeds. General Warranty Deed between Albert Payne and Emma Rinks (Aug. 24, 1908).

From 1908 to 1985, there were many conveyances of the future Gaming Site. *See* Memorandum summarizing chain of title from Linda Anderson, Cherokee Nation Paralegal, to Annette Jenkins, Cherokee Nation Director of Real Estate Services (Sept. 20, 2000). By 1986, the property was owned by Lakeway Building Supply, an Oklahoma corporation. On June 20, 1986, the UKB signed a contract for purchase of the property. The contract gave the UKB immediate possession and use of the property with monthly installments to be paid toward the ultimate purchase price. Contract for Deed between Lakeway Building Supply Inc. and the United Keetoowah Band of Cherokee Indians of Oklahoma (June 20, 1986). By warranty deed signed on November 30, 1990, and recorded by the Cherokee County Clerk on January 2, 1991, the UKB obtained fee simple title to the site. Warranty Deed (Jan. 2, 1991). Since then, the UKB has owned the Gaming Site in fee simple.

The UKB pays annual real property taxes for the Gaming Site to Cherokee County. *See* Real Property Tax Invoices and Receipts between UKB and Cherokee County (2003-2004); Affidavit of Erlene Luper, Cherokee County Assessor (Oct. 7, 2005); UKB's Response at 7 ("The Keetoowah Cherokees admits that it has paid *ad*

*valorem* property taxes on the gaming property."). Although it admits to paying real property taxes, the UKB raises the fact that it has never paid a tax to the State of Oklahoma on the proceeds of its gaming operations. UKB Opening Mem. at 11-12, ex. 8 (Locust Aff.). The State counters that the Oklahoma Tax Code does not impose either a sales tax or a use tax on the proceeds of casino operations. State's Response at 4-5, ex. 24.

According to the UKB, it began to offer public bingo at the Gaming Site in 1986. UKB Opening Mem. at 2, 11, ex. 8 (Locust Aff.).[4] The first evidence of any contact between the NIGC and the UKB comes from late 1991. The NIGC's enabling legislation was enacted in 1988, but the three-member Commission was not fully seated until 1991. In August of that year, the NIGC's first promulgated regulation required all Class II gaming operations "within the jurisdiction of the Commission [to] begin self-administering the provisions of these regulations and [to] begin reporting and paying any fees that are due to the Commission at the end of the third quarter of 1991 (Sept. 30)." 56 Fed. Reg. 40,702 (Aug. 15, 1991). Accordingly, the record contains references to an annual fee payment remitted by the UKB to the NIGC by check dated December 2, 1991. *See* Worksheet for Computing and Reporting Annual Fees Payable by Class II Gaming Operations ("Revised 1990"); *see also* Letter from Anthony J. Hope, NIGC Chairman, to United Keetoowah Bingo (June 22, 1992) (referencing prior UKB fee payment). This was followed by regular quarterly fee worksheets and payments made by the UKB to the NIGC for a number of years.

Thus it is evident that the NIGC became aware of, and began to regulate, the UKB's gaming operation by virtue of the UKB's own action in remitting its first fee payment to the NIGC. No regulatory action on the part of the federal government identified which gaming operations were "within the jurisdiction of the Commission." Rather, each operation was to self-identify and send its own fee worksheets and payments to the NIGC. That is exactly what happened with the UKB, and it was a reasonable approach on the part of the new agency that each facility identifying itself as being "within the jurisdiction of the Commission" by complying with the NIGC's fee regulation was in fact within the NIGC's jurisdiction, unless or until determined otherwise.

In 1993, Tim Harper, now the director of NIGC's regional office in Tulsa, became the first NIGC field representative in Oklahoma. Deposition of Tim Harper at 7-11, 140 (June 2, 2005). One of Mr. Harper's first assignments was to visit all of the Indian gaming operations in his geographical area in order to obtain some basic information about the tribes and their gaming operations. *Id.* at 10-12, 23. For this purpose, NIGC headquarters compiled a list of tribes that Mr. Harper was to visit, and it included the UKB. *Id.* at 11. Around that same time, Mr. Harper informed headquarters staff that he had heard or read about an issue concerning how the UKB Gaming Site might not be on Indian lands or within Indian country. *Id.* at 12-14, 19-23. Nevertheless, Mr. Harper was told by someone in the headquarters office to go ahead and work with the UKB. *Id.* at 28-31. Therefore, he conducted his initial visit to the UKB Gaming Site and met there with

---

[4] We note that 1986 was about five years before the NIGC became operational.

tribal officials. *Id.* at 23. He visited the UKB at least a couple more times from 1993 to 1999, either at the UKB's request or to check on compliance issues. *Id.* at 40-41. *See also* Affidavit of Tim Harper (Oct. 28, 2005) (Cherokee Nation Response ex. 22). We have found no evidence that anyone at the NIGC made any specific determination during 1992 or 1993 that the Gaming Site was on Indian lands. Rather, consistent with the explanation provided above, it appears that Mr. Harper was directed to treat the UKB's gaming operation as being on Indian lands because the UKB had identified its gaming facility as within the NIGC's jurisdiction.

In November 1994, the UKB submitted a request to the NIGC to review and approve a tribal gaming ordinance. Harold Monteau, then Chairman of the NIGC, subsequently approved the UKB's tribal gaming ordinance. Letter from Harold A. Monteau, NIGC Chairman, to John Ross, UKB Chief (March 22, 1995). The gaming ordinance contained no information about any specific site, and the NIGC Chairman was careful to make clear that the ordinance approval was not tantamount to approval of gaming activities on any particular site. As to the issue of Indian lands, the NIGC Chairman wrote in the approval letter:

> It is important to note that the gaming ordinance is approved for gaming only on Indian lands as defined in the IGRA. At the current time, it is the understanding of the NIGC that the Band does not have any lands that meet that definition. Therefore, until such time as it is determined that the Band holds lands that meet the definition in the IGRA, the Band is not authorized to conduct class II or class III gaming.
>
> Thank you for submitting the ordinance of the Band for review and approval. The NIGC staff and I look forward to working with you and the Band in implementing the IGRA once the Band acquires Indian lands.

*Id.*

This approval is the most definitive finding made by the NIGC about the Indian lands status of the Gaming Site and the UKB's authority to conduct gaming there. The approval was an explicit finding by the NIGC Chairman in an agency action authorized and made reviewable by statute, 25 U.S.C. §§ 2705(a)(3), 2714, and it set forth the agency's view that the UKB had no Indian lands. Until that changed, the UKB was not authorized to conduct Class II or Class III gaming. 25 U.S.C. §§ 2710(b)(1)(B), 2710(d)(1)(A)(iii). The Chairman's finding was not appealed to the full Commission or to a federal district court.

However, it also was not followed—not by the UKB or the NIGC. The record shows that the UKB continued to conduct gaming activities on the Gaming Site and continued to send fee payments to the NIGC. *See, e.g.,* Quarterly Statement from United Keetoowah Bingo (March 31, 1995); Quarterly Statement from United Keetoowah Bingo (June 30, 1995); Quarterly Statement from United Keetoowah Bingo (Sept. 30, 1995). The NIGC continued to accept the UKB's fee payments and wrote to the UKB about

them, even warning the UKB when a payment was late that the failure to pay could result in a civil fine or be grounds for closure. *See* Letter from Philip N. Hogen, NIGC Vice Chairman, to John Ross, UKB Chief (May 19, 1998); *see also* Letter from Cindy Altimus, NIGC Administrative Officer, to Cliff Turk, United Keetoowah Bingo Manager (May 17, 1995); Letter from Cindy Altimus, NIGC Compliance Coordinator, to Barbara Turk, United Keetoowah Bingo (Jan. 13, 1997). Additionally, there is evidence indicating that the UKB submitted annual independent audit reports to the NIGC as required by NIGC regulations. Records of receipt for independent auditor reports for fiscal years 1995-1998 (transmitted by e-mail dated Sept. 30, 2004). The NIGC tracked the UKB's compliance with the various IGRA requirements and included the UKB in the NIGC's then-quarterly compliance report to the Secretary of Interior under Public Law No. 104-134 (1996). *See, e.g.,* Excerpt of NIGC Compliance Report (Sept. 30, 1996); Excerpt of NIGC Compliance Report (Dec. 31, 1996); Excerpt of NIGC Compliance Report (March 31, 1997).

NIGC field representatives continued to have contact with UKB officials concerning IGRA and NIGC requirements, including, among other things, submittal of annual independent audit reports to the NIGC; obtaining fingerprints and completing criminal history checks of key employees and primary management officials; and conducting and submitting background investigations for key employees and primary management officials.[5]

In early 2000, the issue of the Gaming Site's status arose again. NIGC Field Investigator Marci Pate received an anonymous telephone call alleging that the UKB's gaming operation was being managed without an approved management contract and that the Gaming Site was not held in trust. *See* Memorandum from Marci Pate, NIGC Field Investigator, to Tim Harper, NIGC Region Director, re Request for Status Determination for United Keetoowah Band of Cherokees (Feb. 22, 2000). Ms. Pate then called the local BIA office and confirmed that the Gaming Site was not in trust. *Id.* Her memorandum concluded by requesting a formal determination concerning the status of lands on which the UKB was conducting gaming. *Id.* In turn, Mr. Harper wrote a memorandum to the NIGC's Washington headquarters office requesting a formal determination of the status of the land prior to investigating the alleged violation of IGRA in order to "be clear that our office has jurisdiction over gaming on this tract of land." Memorandum from Tim Harper, NIGC Region Director, to Alan Fedman, NIGC Director of Enforcement, re Determination of Indian Land – Oklahoma (March 14, 2000).

In April 2000, Mr. Harper was instructed to obtain whatever information the local BIA office had regarding the Gaming Site. E-mail from Richard Schiff to Tim Harper re

---

[5] *See* Report from NIGC Field Representative Tim Harper re Compliance Meeting (Sept. 24, 1998); Report from NIGC Field Investigator Marci Pate re Liaison / Introduce new FI Marci Pate (July 16, 1999); Memorandum from Marci Pate, NIGC Field Investigator, to Alan Fedman, NIGC Director of Enforcement re United Keetoowah Band of Cherokees of Oklahoma Voluntary Compliance – Evergreen (Nov. 29, 1999); NIGC Field Investigator's Site Visit Summary Report from Marci Pate, NIGC Field Investigator, re Compliance – Investigative Reports (Dec. 2, 1999); NIGC Field Investigator's Site Visit Summary Report from Marci Pate, NIGC Field Investigator, re Meeting Requested by Tribe (Dec. 30, 1999); *see also* NIGC Record of Employee Fingerprint Processing for UKB (May 11, 2000, through Dec. 11, 2000).

United Keetoowah (April 4, 2000). The e-mail indicated that the NIGC would write to the UKB and seek its analysis on the issue and the NIGC's Office of General Counsel then would be asked to write a lands opinion. The e-mail reiterated that "Our approval [of UKB's Gaming Ordinance] noted that they did not have Indian land and reminded them that they had to have such land to engage in gaming." *Id.*

NIGC's General Counsel wrote to the UKB and asked whether the Gaming Site was on Indian lands under IGRA and the NIGC's regulations. Letter from Kevin Washburn, NIGC General Counsel, to Jim Henson, UKB Chief, re Indian lands inquiry (May 25, 2000). The UKB replied with a letter providing the NIGC with a copy of the license issued by the UKB to the Keetoowah Bingo facility and a list of NIGC-approved gaming ordinances obtained from the NIGC's website, which included the UKB. Letter from Jim Henson, UKB Chief, to Kevin Washburn, NIGC General Counsel, re NIGC Letter, 25 May 2000 (June 14, 2000). On August 19, 2000, the UKB submitted to the NIGC a copy of an application to the DOI to have the Gaming Site placed into trust. Letter from G. William Rice, UKB Assistant Chief, to Kevin Gover, DOI Assistant Secretary – Indian Affairs, re Land Use Plan / Trust Request (Aug. 19, 2000).

Subsequently, the NIGC's General Counsel issued the September 2000 Letter concluding that the Gaming Site was not Indian lands under IGRA because the UKB did not have the requisite jurisdiction over the site and therefore that the NIGC also lacked jurisdiction. On February 15, 2001, the UKB sent the NIGC a letter that made several statements and legal arguments in support of the position that the Gaming Site qualifies as a "dependent Indian community" under 18 U.S.C. § 1151. Letter from Jimmie Lou Whitekiller, UKB Tribal Secretary, to Kevin K. Washburn, NIGC General Counsel (Feb. 15, 2001). The letter requested reconsideration of the September 2000 Letter. *Id; see also* Notice to Whom It May Concern from Henry Dreadfulwater, UKB Gaming Commission Chairman (Feb. 16, 2001). In February 2002, the UKB sent a letter to the NIGC Chairman requesting that he direct NIGC staff to resume performance of their statutory duties with regard to the UKB's gaming facility. Letter from Dallas Proctor, UKB Chief, to Montie Deer, NIGC Chairman (Feb. 25, 2002). This letter contained a legal analysis supporting the UKB's position that the Gaming Site is Indian lands by virtue of being restricted fee land within the UKB's jurisdiction and over which the UKB exercised governmental power. *Id.*

The NIGC did not grant the UKB's requests to reconsider, nor did it change its conclusion about its lack of jurisdiction. *See* Declaration of Penny J. Coleman, NIGC Acting General Counsel (July 8, 2004). Since September 2000 through the present, the NIGC's contacts with the UKB have been very limited and have not dealt with the regulation of the UKB's ongoing gaming activities. For example, in April 2001, an NIGC field investigator visited the Gaming Site simply to confirm that the gaming facility had reopened. NIGC Field Investigator's Site Visit Report re Confirm Gaming Activities (April 20, 2001). In November 2001, the same investigator met with UKB tribal officials in order to discuss an overpayment of prior fees and a potential refund. NIGC Field Investigator's Site Visit Report (Nov. 19, 2001). During this meeting, the investigator "emphasized that because it is the NIGC's opinion the Tribe was not within the NIGC's

jurisdiction, [she] was unable to comment on the Tribe's gaming issues." *Id.* There is evidence in the record that until 2002, the NIGC continued to assist the UKB obtain FBI criminal history checks on its key employees and primary management officials by forwarding fingerprint cards from the UKB to the FBI and in turn sending the FBI criminal history reports to the UKB—a service that the NIGC offers to all gaming tribes. *See* E-mail chain between Tim Harper, NIGC Region Director; Cindy Altimus, NIGC Field Investigator; Marci Pate, NIGC Field Investigator; and Sharon Stivers, NIGC Administrative Assistant (July 30, 2002). But this activity was in the nature of administrative technical assistance rather than regulation; and in any case, it ceased around July 2002.

On April 12, 2006, the UKB submitted a new application to the BIA to have the Gaming Site taken into trust. The United Keetoowah Band of Cherokee Indians in Oklahoma, Land Into Trust Application on 2.03 Acre Parcel Located in Tahlequah, Cherokee County, State of Oklahoma, For the Purpose of Gaming Under 25 U.S.C. § 2719, Section 20 (April 12, 2006). On May 1, 2007, the BIA Regional Office wrote to the Cherokee Nation, the State of Oklahoma, Cherokee County, and other branches of state and local government in order to invite comment on the proposed acquisition. Letter from Jeanette Hanna, BIA Regional Director, to the Honorable Chadwick Smith, Cherokee Nation Principal Chief (May 1, 2007); Letter from Jeanette Hanna, BIA Regional Director, to the Honorable Brad Henry, Governor of Oklahoma (May 1, 2007); Letter from Jeanette Hanna, BIA Regional Director, to the Board of County Commissioners, Cherokee County (May 1, 2007). The Cherokee Nation submitted a response with exhibits. Letter from Chad Smith, Cherokee Nation Principal Chief, and Diane Hammons, Cherokee Nation Acting General Counsel, to Jeanette Hanna, BIA Regional Director (received June 18, 2007). The UKB's April 2006 Gaming Site trust application remains pending with the Director of the BIA and the Assistant-Secretary of Indian Affairs' (AS-IA) Office of Indian Gaming.[6]

---

[6] In the context of a UKB trust application for a different parcel in Cherokee County (the 76-acre "Community Services Parcel"), the AS-IA disavowed the position that the Cherokee Nation has exclusive jurisdiction over trust and restricted lands within the former Cherokee reservation. *United Keetoowah Band of Cherokee Indians v. Director, Eastern Oklahoma Region, Bureau of Indian Affairs,* Decision of the Assistant Secretary – Indian Affairs (June 24, 2009). Subsequently, the AS-IA issued another decision in that matter withdrawing portions of the June 24, 2009 decision relating to the UKB as a successor in interest to the historic Cherokee Nation. *United Keetoowah Band of Cherokee Indians v. Director, Eastern Oklahoma Region, Bureau of Indian Affairs,* Decision of the Assistant Secretary – Indian Affairs (Sept. 10, 2010). But AS-IA's recent decision specifically reaffirmed that part of the June 2009 decision regarding whether a trust acquisition for the UKB would create conflicting jurisdiction. *Id.* The June 2009 decision held that "[t]he UKB would have exclusive jurisdiction over land that the United States holds in trust for the Band." *United Keetoowah Band of Cherokee Indians v. Director, Eastern Oklahoma Region, Bureau of Indian Affairs,* Decision of the Assistant Secretary – Indian Affairs (June 24, 2009). On May 24, 2011, the Bureau of Indian Affairs, Acting Regional Director issued a decision to acquire 76 acres of land into trust for the United Keetoowah Band. That 76 acre parcel is not at issue here.

## III. Legal Analysis

IGRA created the NIGC and vested it with certain powers of regulatory oversight and enforcement. *See, e.g.*, 25 U.S.C. §§ 2706(b)(1) (monitor Class II gaming on Indian lands); 2706(b)(2) (inspect and examine all premises located on Indian lands on which Class II gaming is conducted); 2713 (levy civil fines and closure orders); 2717 (collect NIGC fees from Class II or Class III activities regulated by IGRA). Not surprisingly, IGRA limits the NIGC's authority to regulate gaming activities to those that take place on Indian lands.[7] Consequently, the NIGC lacks jurisdiction over any such activities that take place on lands that do not constitute "Indian lands." IGRA defines *Indian lands* as:

> (A) all lands within the limits of any Indian reservation; and
>
> (B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power.

25 U.S.C. § 2703(4). The NIGC's regulations clarify that definition, stating:

> *Indian lands* means:
>
> (a) Land within the limits of an Indian reservation; or
>
> (b) Land over which an Indian tribe exercises governmental power and that is either—
>
> > (1) Held in trust by the United States for the benefit of any Indian tribe or individual; or
> >
> > (2) Held by an Indian tribe or individual subject to restriction by the United States against alienation.

25 C.F.R. § 502.12.

### A. Indian Reservation

The UKB does not argue that it has a current reservation and the DOI has confirmed that it does not. *See* Letter from Martin Steinmetz, Acting Field Solicitor, to Kevin Washburn, NIGC General Counsel (Aug. 10, 2000). Rather, the UKB argues that the Gaming Site qualifies as Indian lands because it is within the boundaries of the former Cherokee Reservation. UKB Opening Mem. at 23-24 ("It is undisputed that the Keetoowah Cherokee gaming facility occupies fee land within the boundaries of the former Cherokee Reservation."); UKB Response Mem. at 30-32. The UKB argues that

---

[7] Specifically, under IGRA, an Indian tribe may engage in Class II gaming only "on Indian lands within such tribe's jurisdiction." 25 U.S.C. § 2710(b)(1). Similarly, IGRA states that "Class III gaming activities shall be lawful on Indian lands only if such activities are—(A) authorized by an ordinance or resolution that—(i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands . . . . 25 U.S.C. § 2710(d)(1)(A)(i).

the NIGC has interpreted the term *Indian reservation* in IGRA to include former reservations. To support this argument, the UKB relies on a NIGC memorandum concerning the White Earth Reservation, characterizing that memorandum as an analysis of gaming on fee land within the boundaries of the "former" White Earth Reservation. *Id.* at 23. That memorandum, however, does not interpret *Indian reservation* to include former reservations. *See* Memorandum from Cindy Shaw, NIGC Staff Attorney, to NIGC Acting General Counsel (March 14, 2005) ("White Earth Memorandum"). Rather, the White Earth Memorandum concerns an existing reservation. It states that although the White Earth Reservation was diminished and subjected to allotment by an act of Congress, the Reservation was not disestablished. *Id.* at 3 ("The Nelson Act . . . diminished the White Earth Reservation. . . . [But the] Minnesota Supreme Court held that the remaining 32 of the original 36 townships on the reservation were not disestablished."). The term *former reservation* is nowhere used in the memorandum.

To the contrary, *Indian reservation* in 25 U.S.C. § 2703(4) refers only to existing federal Indian reservations. *Cf. Citizens Exposing Truth About Casino v. Kempthorne*, 492 F. 3d 460, 470-71 (D.C. Cir. 2007) (IGRA refers only to federal, not state, reservations). Interpreting the term to include former reservations would significantly expand lands eligible for gaming. That Congress did not intend this interpretation is supported by the language of IGRA itself, which specifically distinguishes between reservations existing on the date of IGRA's enactment and former reservations in Oklahoma. *Compare* 25 U.S.C. § 2719(b)(1) *with id.* § 2719(b)(2)(A)(i).

Furthermore, the DOI recently issued regulations defining the term *reservation* in IGRA as:

> (1) Land set aside by the United States by final ratified treaty, agreement, Executive Order, Proclamation, Secretarial Order or Federal statute for the tribe, notwithstanding the issuance of any patent;
>
> (2) Land of Indian colonies and rancherias (including rancherias restored by judicial action) set aside by the United States for the permanent settlement of the Indians as its homeland;
>
> (3) Land acquired by the United States to reorganize adult Indians pursuant to statute; or
>
> (4) Land acquired by a tribe through a grant from a sovereign, including pueblo lands, which is subject to a Federal restriction against alienation.

25 C.F.R. § 292.2.

The regulations contain a separate definition of *former reservation*, which is defined to mean "lands in Oklahoma that are within the exterior boundaries of the last reservation that was established by treaty, Executive Order, or Secretarial Order for an Oklahoma tribe." *Id.* These terms have distinct meanings in the context of both tribal lands in Oklahoma and gaming on those lands under IGRA. In the present matter, the

UKB's lands encompassing the Gaming Site are not within the limits of an Indian reservation within the meaning of IGRA.

### B. Restricted Fee Land

If a site is not within an existing Indian reservation, it may still qualify as Indian lands if it is trust or restricted fee land over which an Indian tribe exercises governmental power. *See* 25 U.S.C. § 2703(4)(B); 25 C.F.R. § 502.12(b). There is no dispute that the Gaming Site is not held in trust. Instead, the UKB argues that the Gaming Site is restricted fee land—that it is "held by an Indian tribe . . . subject to restriction by the United States against alienation and over which an Indian tribe exercises governmental power." 25 U.S.C. § 2703(4)(B). There are three necessary elements for a parcel to qualify as Indian lands under this provision: (1) it must be held by an Indian tribe; (2) it must be subject to restriction by the United States against alienation; and (3) the Indian tribe must exercise governmental power over it. The third element consists of two requirements: (a) the Indian tribe must have legal jurisdiction over the land; and (b) the Indian tribe must actually exercise governmental power over it.

#### 1. Indian Tribe

There is no dispute that the UKB is a federally recognized Indian tribe. *See, e.g.*, Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 73 Fed. Reg. 18,553, 18,556 (Apr. 4, 2008). Furthermore, the deeds for the Gaming Site demonstrate that the lands are owned in fee by the UKB. Therefore, the Gaming Site is held by an Indian tribe.

#### 2. Subject to Restriction by the United States Against Alienation

Under the second element, the lands must be "subject to restriction by the United States against alienation . . . ." 25 U.S.C. § 2703(4)(B). The warranty deed for the Gaming Site does not contain an express restriction against alienation. On its face, the deed conveyed the land in fee simple from the prior owner, a building supply company, to the UKB. *See* Warranty Deed (Jan. 2, 1991). The UKB argues that the land is subject to restriction through operation of two separate sources—the Nonintercourse Act, 25 U.S.C. § 177, and the UKB's federal charter. *See* UKB Supplemental Brief (Sept. 28, 2009); Letter from Dallas Proctor, UKB Chief, to Montie Deer, NIGC Chairman (Feb. 25, 2002); Letter from William Rice, UKB Assistant Chief, for Jim Henson, UKB Chief, to Bruce Babbitt, Secretary of Interior (undated; faxed to Montie Deer, NIGC Chairman, on Sept. 8, 2000).

In the September 2000 Letter, the NIGC's General Counsel stated that *Buzzard* "unequivocally indicated" that lands purchased in fee by UKB are subject to a restraint against alienation pursuant to 25 U.S.C. § 177 and by operation of the terms of the UKB's Secretarially approved corporate charter. The General Counsel also noted that whether the Nonintercourse Act or the UKB's charter create a restriction against alienation "by the United States" sufficient to create "Indian lands" "is an exceedingly

13

difficult question," but concluded that "we need not reach this difficult question." September 2000 Letter at 4. We agree with the former General Counsel's approach because, for the reasons set forth below, UKB lacks legal jurisdiction to exercise governmental power over the Gaming Site.

### 3. The Indian Tribe Must Have Jurisdiction and Exercise Governmental Power Over the Land.

A site may qualify as Indian lands if it is trust or restricted fee lands over which an Indian tribe exercises governmental power. *See* 25 U.S.C. § 2703(4)(B); 25 C.F.R. § 502.12(b). Tribal jurisdiction is a threshold requirement to the exercise of governmental power as required by IGRA's definition of Indian lands. *See e.g., Rhode Island v. Narragansett Indian Tribe*, 19 F.3d 685, 701-703 (1st Cir. 1994), *cert. denied*, 513 U.S. 919 (1994), *superseded by statute as stated in Narragansett Indian Tribe v. National Indian Gaming Commission*, 158 F.3d 1335 (D.C. Cir. 1998) ("In addition to having jurisdiction, a tribe must exercise governmental power in order to trigger [IGRA]"); *Miami Tribe of Oklahoma v. United States*, 5 F. Supp. 2d 1213, 1217-18 (D. Kan. 1998) (*Miami II*) (a tribe must have jurisdiction in order to exercise governmental power); *Miami Tribe of Oklahoma v. United States*, 927 F. Supp. 1419, 1423 (D. Kan. 1996) (*Miami I*) ("the NIGC implicitly decided that in order to exercise governmental power for purposes of 25 U.S.C. § 2703(4), a tribe must first have jurisdiction over the land"); *State ex. rel. Graves v. United States*, 86 F. Supp. 2d 1094 (D. Kan. 2000), *aff'd and remanded sub nom., Kansas v. United States*, 249 F.3d 1213 (10th Cir. 2001). Importantly, the Tenth Circuit requires that "before a sovereign may exercise governmental power over land, the sovereign, in its sovereign capacity, must have jurisdiction over that land." *Kansas v. United States*, 249 F.3d 1213, 1229 (10th Cir. 2001). This interpretation is consistent with IGRA's language limiting the applicability of its key provisions to "[a]ny Indian tribe having jurisdiction over Indian lands," or to "Indian lands within such tribe's jurisdiction." 25 U.S.C. §§ 2710(d)(3)(A), 2710(b)(1)); *see also Narragansett Indian Tribe*, 19 F.3d at 701-703. Therefore, whether the UKB possesses jurisdiction over the Gaming Site is a threshold question.

Generally speaking, an Indian tribe possesses jurisdiction over land that the tribe inhabits if the land qualifies as "Indian country." *See Alaska v. Native Village of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1 (1998); *United Keetoowah Band of Cherokee Indians of Oklahoma v. United States Dept. of Housing and Urban Development*, No. 08-7025, slip op. at 11 n.5 (10th Cir. June 5, 2009) ("[A]s a general matter, Indian tribes exercise court jurisdiction over Indian country—reservations, dependent Indian communities, and Indian allotments."). Congress defined the term *Indian country* as: "(a) all land within the limits of any Indian reservation . . . , (b) all dependent Indian communities . . . , and (c) all Indian allotments, the Indian titles to which have not been extinguished . . . ." 18 U.S.C. § 1151. This definition, found in the criminal code, "generally applies to questions of civil jurisdiction[.]" *Venetie*, 522 U.S. at 527.

Relying on *Venetie*, the UKB asserts that the Gaming Site constitutes Indian country if it is subject to federal set-aside and superintendence. *Venetie* interpreted the

term *dependent Indian community* to refer "to a limited category of Indian lands that are neither reservations nor allotments, and that satisfy two requirements—first, they must have been set aside by the Federal Government for the use of the Indians as Indian land; second, they must be under federal superintendence." *Id.* at 527. For the reasons set forth above in Section III. A., the Gaming Site does not constitute Indian country under 25 U.S.C. § 1151(a). Further, the UKB does not assert that the land constitutes Indian country pursuant to 25 U.S.C. § 1151(c). *Cf.* UKB Response Mem. at 6 ("The Keetoowah Cherokees has not argued that the property at issue here fits nicely within a pre-conceived notion of Indian Country under § 1151."). According to the UKB, it only has jurisdiction if the Gaming Site is subject to a federal set-aside and federal superintendence, *i.e.*, if the Gaming Site is a dependent Indian community. *Venetie*, 522 U.S. at 530-31 (1998); UKB Opening Mem. at 16-20; UKB Response Mem. at 5-13; UKB Supplemental Mem. at 3-7. In our opinion, the Gaming Site is not subject to a federal set-aside. Accordingly, we need not reach the issue of whether the Gaming Site is subject to federal superintendence.

Federal set-aside requires a federal action "indicating that it set aside the land for the use by the UKB." *Buzzard*, 922 F.2d at 1076. It is *federal* action, not tribal government action, that is required. "[B]ecause Congress has plenary power over Indian affairs, *see* U.S. CONST.. *art.* I, § 8, cl. 3, some explicit action by Congress (or the executive, acting under delegated authority) must be taken to create or to recognize Indian country." *Venetie*, 522 U.S. 531 at n.6.

The UKB argues that the federal action to set aside the Gaming Site here comes in the form of the Non-intercourse Act and the UKB's charter. That argument has been considered and rejected by the Tenth Circuit. *Buzzard*, 922 F.2d at 1076 ("No action has been taken by the federal government indicating that it set aside the land for use by the UKB."). Like the lands at issue in *Buzzard*, the restriction against alienation imposed by the Non-intercourse Act and by operation of the of UKB's corporate charter,

> may show a desire to protect the UKB from unfair disposition of its land, but does not of itself indicate that the federal government intended the land to be set aside for the UKB's use. . . . If the restriction against alienation were sufficient to make any land purchased by the UKB Indian country, the UKB could remove land from state jurisdiction and force the federal government to exert jurisdiction over that land without either sovereign having any voice in the matter. Nothing in …the cases concerning trust land indicates that the Supreme Court intended for Indian tribes to have such unilateral power to create Indian country.

*Buzzard*, 922 F.2d at 1076-77; *see also Kansas v. United States*, 249 F.3d 1213, 1218-19 (10th Cir. 2001) (tribe's unilateral actions adopting property owners into the tribe and then leasing and developing their land did not restore the parcel to tribe's jurisdiction). Further, we disagree with the UKB's contention that NIGC's past regulatory actions or BIA's loan guarantee serve to satisfy the federal set-aside requirement. UKB Opening Mem. at 16-20. Congress has authorized the Secretary of the Department of the Interior, not NIGC, to set-aside lands for Indian tribes, and the Secretary has not yet exercised that

power for the benefit of the UKB. Thus, the requirement of federal set-aside has not been met.

Further, we note that NIGC's regulatory activities described in Section II(B) cannot independently create Indian country. While Congress has granted the Department of the Interior and other federal agencies broad authority regarding tribal lands, the NIGC's regulatory authority is limited to "Indian lands" as defined by IGRA. 25 U.S.C. § 2703(4). IGRA, by its terms, applies only to gaming on Indian lands. *See, e.g.*, 25 U.S.C. § 2710(a)(2) ("any class II gaming on Indian lands shall continue to be within the jurisdiction of the Indian tribes, but shall be subject to the provisions of this chapter"); 25 U.S.C. § 2710(b)(1) (requiring approved tribal gaming ordinance for the conduct of Class II gaming on Indian lands); *id.* (requiring tribal licensure of each gaming facility on Indian lands); 25 U.S.C. § 2710(b)(4)(A) (permitting licensure of individually owned gaming on Indian lands); 25 U.S.C. § 2710(d)(1) (requiring approved tribal gaming ordinance for the conduct of Class III gaming on Indian lands); 25 U.S.C. § 2710(d)(3)(A) (requiring a tribal-state compact for Class III gaming on Indian lands); Sen. Rep. 100-446 at p. A-1. (IGRA "is the outgrowth of several years of discussions and negotiations between gaming tribes, States, the gaming industry, the administration, and the Congress, in an attempt to formulate a system for regulating gaming on Indian lands").

Likewise, the powers IGRA grants the Commission and the Chairwoman extend only as far as Indian lands extend. *See, e.g.*, 25 U.S.C. § 2705(a)(3) (power to approve tribal gaming ordinances for gaming on Indian land); 25 U.S.C. § 2705(a)(4) (power to approve management contracts for gaming on Indian lands); 25 U.S.C. § 2713 (enforcement power for violations of IGRA, NIGC regulations, or tribal gaming ordinances); 25 U.S.C. § 2706(b)(1), (2), (4) (powers to monitor gaming, inspect premises, and demand access to records for Class II gaming on Indian lands); 25 U.S.C. § 2702(3)("The purpose of this Act is ... to declare that the establishment of independent Federal regulatory authority for gaming on Indian lands, the establishment of Federal standards for gaming on Indian lands, and the establishment of a National Indian Gaming Commission are necessary to meet congressional concerns regarding gaming..."). In short, in the absence of Indian lands, IGRA grants neither the Commission nor the Chairwoman any jurisdiction to exercise regulatory authority over the Gaming Site. The NIGC only has authority to regulate existing Indian lands; it does not have authority to decide to regulate lands not otherwise eligible for gaming under IGRA. Accordingly, the NIGC's past actions cannot and do not create Indian lands or Indian country.

Because the Gaming Site was not set aside by the federal government, it is not Indian country. Accordingly, the Gaming Site does not constitute "Indian lands" under IGRA because the UKB currently lacks jurisdiction over the Gaming Site.[8]

---

[8] The Assistant Secretary—Indian Affairs has explained that if he takes such a parcel into trust, it will come within the UKB's exclusive jurisdiction. *United Keetoowah Band of Cherokee Indians v. Director, Eastern Oklahoma Region, Bureau of Indian Affairs*, Decision of the Assistant Secretary – Indian Affairs (June 24, 2009)( "The UKB would have exclusive jurisdiction over land that the United States holds in trust for the Band."); *United Keetoowah Band of Cherokee Indians v. Director, Eastern Oklahoma Region, Bureau of*

## IV. Conclusion

On remand, it is our opinion that the UKB's Gaming Site is not on Indian lands as that term is defined by IGRA and the NIGC's regulations. The federal government has taken no action to set-aside these lands for the use of the UKB. In addition, the NIGC's past regulatory activities on the Gaming Site cannot create Indian Country. This analysis must be reevaluated if the DOI accepts the Gaming Site into trust for the benefit of the United Keetoowah Band.

The DOI, Office of the Solicitor, concurs with this opinion. Letter from Patrice H. Kunesh, Deputy Solicitor—Division of Indian Affairs, to Lawrence S. Roberts, General Counsel, NIGC (Jun. 16, 2011).

---

*Indian Affairs,* Decision of the Assistant Secretary – Indian Affairs (September 10, 2010)(reaffirming June 2009 decision regarding jurisdiction). Federal courts agree that when the Secretary of the Interior takes land into trust for an Indian tribe, it meets the federal set aside and superintendence requirements to become Indian Country. *U.S. v. Roberts*, 185 F.3d 1125, 1131 (10th Cir. 1999). Therefore, if the Gaming Site is taken into trust by the United States, the UKB will have exclusive jurisdiction, and this opinion shall be revisited.